**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 13 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENCH CIRCUIT

JEMAINE MONTEIL CANNON,

           Petitioner - Appellant,

    v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

           Respondent - Appellee.

No. 03-5008

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 99-CV-297-H(M))**

---

Stephen J. Greubel, Tulsa, Oklahoma (Jemaine Monteil Cannon, with him on the briefs), for Petitioner - Appellant.

Brant M. Elmore, Assistant Attorney General, Criminal Division (W. A. Drew Edmondson, Attorney General, and David M. Brockman, Assistant Attorney General, Criminal Division, on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

---

Before **KELLY** , **HARTZ** , and **O'BRIEN** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

Jemaine Monteil Cannon was convicted in Oklahoma state court of first degree murder and sentenced to death. After the Oklahoma Court of Criminal Appeals (OCCA) denied his direct appeal and his pro se state petition for post-conviction relief, Mr. Cannon timely filed an application for relief under 28 U.S.C. § 2254. The United States District Court for the Northern District of Oklahoma rejected Mr. Cannon's request for an evidentiary hearing and denied all relief.

On appeal Mr. Cannon raises numerous claims of ineffective assistance of trial counsel; three claims of trial counsel misconduct, which we recharacterize as additional claims of ineffective assistance of counsel; and a claim of ineffective assistance of appellate counsel for failure to pursue on appeal the claims of ineffectiveness of trial counsel. We have jurisdiction under 28 U.S.C. § 2253 and 28 U.S.C. §1291. We affirm on all claims except three. There are factual issues regarding the merits and procedural bar with respect to Mr. Cannon's allegations that (1) his trial counsel failed to notify the court of improper contacts between prosecution witnesses and jurors during trial recesses, and (2) his trial counsel prevented him from testifying in his own defense at trial. We therefore reverse and remand to the district court for further proceedings on those two claims. We also remand for further consideration Mr. Cannon's claim of ineffective assistance of appellate counsel.

## I. FACTUAL BACKGROUND

Because Mr. Cannon filed his habeas petition after the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that statute governs our review. See Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999). Under AEDPA factual determinations made by state courts are presumed to be correct. See 28 U.S.C. § 2254(e)(1). Thus, we adopt the OCCA's recitation of facts.

> On February 3, 1995, [Mr. Cannon] stabbed to death his girlfriend, Sharonda Clark [also referred to as Sharonda White]. The contested issue at trial was whether [Mr. Cannon] stabbed Clark with malice aforethought or in self-defense. Tulsa police found Clark's body in her apartment after Jacque Pepper contacted police when she could not locate Clark who had been missing for over twenty-four hours. Clark had been stabbed several times in the neck and chest. She also had incise wounds on her hands commonly characterized as defensive wounds. Sheena Elliott testified that she saw [Mr. Cannon] and Clark around noon on the third and that she sensed they were having an argument. Elliott tried to telephone Clark later in the afternoon to check on her, but [Mr. Cannon] told her that Clark was not there even though Elliott could hear Clark in the background. No one, except [Mr. Cannon], had contact with Clark after noon on the third.

> On February 4, 1995, [Mr. Cannon] borrowed money, bought a bus ticket and went to Flint, Michigan to stay with an uncle. From Michigan, [Mr. Cannon] telephoned his mother who told him Clark was dead and to turn himself in and tell police his side of the story. After convincing [Mr. Cannon] to turn himself in, [Mr. Cannon]'s mother told Tulsa police detective Tom Fultz [Mr. Cannon]'s location. Shortly thereafter, [Mr. Cannon] telephoned Detective Fultz and told him that he killed Clark in self-defense. [Mr. Cannon] was arrested shortly after his conversation with Fultz and he was returned to Oklahoma. Although [Mr. Cannon] claimed he killed Clark in self-defense and that they had a violent fight,

-3-

[Mr. Cannon] did not have any wounds or noticeable abrasions when he was arrested.

Cannon v. State, 961 P.2d 838, 843 (Okla. Crim. App. 1998). Other facts will be set forth as necessary to the discussion.

## II. PROCEDURAL HISTORY

A jury in the District Court of Tulsa County, Oklahoma, convicted Mr. Cannon of murder in the first degree. The jury found four aggravating circumstances and recommended a sentence of death. The trial court sentenced him accordingly. Mr. Cannon was represented at trial by attorneys Sid Conway and Julie O'Connell from the Tulsa Public Defender's office. A different attorney from the Tulsa Public Defender's office, Barry Derryberry, represented Mr. Cannon on direct appeal to the OCCA, which affirmed his conviction. See Cannon v. State, 961 P.2d 838.

Mr. Cannon later pursued post-conviction remedies in the OCCA. Although he was originally represented by the Oklahoma Indigent Defense System (OIDS), an entity distinct from the Public Defender's office, he later elected to represent himself, with OIDS serving as standby counsel. He raised a number of claims of ineffective assistance of counsel and sought an evidentiary hearing. The OCCA denied relief and denied his request for an evidentiary hearing.

-4-

On August 16, 1999, Mr. Cannon filed an application for relief under 28 U.S.C. § 2254 with the United States District Court for the Northern District of Oklahoma. The district court denied the application on December 9, 2002. Mr. Cannon obtained a certificate of appealability (COA) from the district court on the ineffective-assistance-of-counsel and trial-counsel-misconduct issues. See 28 U.S.C. § 2253(c). He filed an opening brief and a reply brief with this court; standby counsel filed a supplemental brief addressing only procedural bar and appeared at oral argument on behalf of Mr. Cannon. We now address the issues authorized by the COA.

## III. DISCUSSION

All Mr. Cannon's claims on appeal amount to allegations of ineffective assistance of counsel. We will address the claim of ineffective assistance of appellate counsel after concluding our discussion of the claims of ineffective assistance of trial counsel.

To prevail on a trial-counsel-ineffectiveness claim, a defendant must satisfy the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). First, he must show that counsel's performance was deficient. Id. at 687. Second, he must show that counsel's deficient performance prejudiced his defense. Id. To show that counsel's performance was deficient, the defendant must demonstrate that counsel's

performance "fell below an objective standard of reasonableness." id. at 688—that is, was not "within the range of competence demanded of attorneys in criminal cases." Id. at 687 (internal quotation marks omitted). To show prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, . . . the [jury] would have had a reasonable doubt respecting guilt." Id. at 694-95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

None of Mr. Cannon's current ineffective-assistance claims was raised on direct appeal to the OCCA. Oklahoma, unlike most jurisdictions, generally requires a criminal defendant to raise such claims on direct appeal or forfeit them. See 22 Okla. Stat. §§ 1086, 1089; Walker v. State, 933 P.2d 327, 332 (Okla. Cr. App. 1997). As a result, the State argues that Mr. Cannon's claims are procedurally barred.

When questions of procedural bar are problematic, however, and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits. See Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000). All but two of Mr. Cannon's claims of ineffective trial counsel are clearly without merit, so we will dispose of them without regard to procedural bar. We will then address the remaining two claims; after determining that these claims have potential merit, we

will proceed to consider whether they are procedurally barred and whether Mr. Cannon should have the opportunity to develop the pertinent facts at an evidentiary hearing.

## A.    Meritless Claims

Under AEDPA we may not grant Mr. Cannon's application for relief:

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If, however, the state court did not adjudicate a claim on the merits, this court defers to any state-court factual determinations, see 28 U.S.C. § 2254 (e)(1) ( "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."), and addresses issues of law *de novo*, while reviewing the district court's findings of fact for clear error. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). Because Mr. Cannon proceeds pro se, we construe his appellate brief liberally. See Cummings v. Evans, 161 F.3d 610, 613 (10th Cir. 1998).

## 1. Detective's testimony

At trial the prosecution played a tape of a conversation between Mr. Cannon and Detective Fultz, who had investigated the crime scene. On the tape Mr. Cannon admitted killing the victim, but claimed that he had killed her in self-defense. After the tape was played, the prosecutor asked Detective Fultz, "Based on what the defendant was telling you and based upon what you were seeing from the scene, what opinions did you form about what the defendant was telling you?" Tr. 764. Defense counsel objected to this question as irrelevant. The court overruled the objection. Detective Fultz then answered, "I did not believe Mr. Cannon's version of what had occurred." Tr. 765.

Mr. Cannon now argues that his trial attorney was ineffective for not objecting to the question on the ground that it called for improper opinion testimony. We reject this claim because we are bound by the OCCA's determination on the merits that any error in admitting Fultz's opinion was harmless. In resolving Mr. Cannon's direct appeal, the OCCA wrote:

> Even if we construed Fultz' statement as an improper opinion telling the jury what to find, defense counsel attacked Fultz on cross-examination because he could not produce any evidence of who started the fight, who had the knife first or any statements of the victim to disprove [Mr. Cannon's] self defense claim. Defense counsel's attempts to expose the basis of Fultz' conclusion on cross-examination cured any error which could have resulted."

Cannon, 961 P.2d at 846.

-8-

Because the OCCA neither adjudicated the claim in a manner that was "contrary to, or . . . an unreasonable application of, clearly established Federal law" nor made its decision "based on an unreasonable determination of the facts," we must deny relief. See 28 U.S.C. § 2254(d).

### 2. Doctor's testimony

Mr. Cannon claims that his trial counsel was ineffective for failure to raise several objections to testimony by Dr. Hemphill, who examined the victim's body. He contends that Dr. Hemphill (1) offered objectionable testimony on the element of intent by declaring that the cause of death was "homicide"; (2) improperly testified that certain wounds on the victim were "defense wounds"; (3) improperly testified that a necklace found at the scene could have caused some of the victim's injuries; (4) lacked sufficient knowledge to testify; and (5) should have been cross-examined regarding the time of death. Mr. Cannon also contends that counsel was ineffective for failing to object to the prosecution's mischaracterization of Dr. Hemphill's testimony during closing argument.

### a. "Homicide" testimony

Mr. Cannon complains that Dr. Hemphill was permitted to testify that the cause of the victim's death was homicide. The following exchange occurred during direct examination of Dr. Hemphill:

Q : And based on viewing what you viewed, did you formulate an opinion as to the manner of death?

-9-

A:     Yes.

Q:     And in your expert opinion, what was the manner of death?

A:     Homicide.

Tr. at 881.

On cross-examination the defense attorney followed up on this line of

questioning:

Q:     Dr. Hemphill, you, uh, said that you have formulated the opinion that
       this was a homicide, right?

A:     Yes.

Q:     Would you please define for me what you mean when you say
       homicide?

A:     Yes.  Part of the Medical Examiner's responsibility in investigating a
       case is to give an opinion as to the appropriate manner into which the
       death should be classified.  Our report is incomplete without it.  It's
       only an opinion.  It's not a ruling.  Nobody has to do anything based
       on it, but *homicide, the way we use it, means that the death, in our
       opinion, the death was caused by the action of another person and
       that action was intended to cause harm* and that's all it means.

Id. at 884-85 (emphasis added).

On re-direct examination, the prosecutor asked, "And is there anything that

you thought about on cross examination that changes your opinion regarding your

classification of [the victim's] death as a homicide, that being intended to cause

harm?"  The witness answered, "No, there isn't."  Id. at 890.

On recross-examination, the defense attorney asked, "Your definition of homicide includes the intent to cause harm?" The witness answered "Yes." Id.

Whatever the basis of Mr. Cannon's concerns about this testimony, he has failed to show any possibility of prejudice. Dr. Hemphill's description of the cause of death as "homicide" was completely consistent with Mr. Cannon's theories of the case. There was no issue regarding Mr. Cannon's intent to harm the victim. The only issues were whether he acted in self-defense and, if not, whether his culpability was only for manslaughter. See 21 Okla. Stat. § 711 (defining manslaughter as "homicide" "[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide" or "[w]hen perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed"). Neither defense theory excludes an intent to cause harm.

### b.    "Defense-wound" testimony

Mr. Cannon argues that his trial counsel should have objected to Dr. Hemphill's testimony that certain wounds on the victim were "defense wounds." First, he asserts that the testimony constituted "unfair surprise," because Dr. Hemphill's expert report did not so classify the wounds. Aplt. Br. at

-11-

6. To the extent that Mr. Cannon is contending that his counsel should have raised a constitutional objection to the testimony on the ground that he was not warned of the testimony in advance, he does not explain, nor do we perceive, how his contention survives the proposition that "[t]here is no general constitutional right to discovery in a criminal case . . . ." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). There was also no meritorious state-law objection available to his counsel. Oklahoma law requires the State, upon request by the defense, to disclose expert reports "including results of physical or mental examinations and of scientific tests, experiments, or comparisons." 22 Okla. Stat. § 2002(A)(1)(d). But it does not require that everything to which an expert testifies be contained in the expert's report. Cf. Fed. R. Civ. P. 26(a)(2)(B) (requiring retained experts to prepare a report "contain[ing] a complete statement of all opinions to be expressed and the basis and reasons therefor"); Fed. R. Crim. P. 16(a)(1)(G) (at defendant's request, the government must provide a written summary of expert testimony to be used during its case-in-chief at trial). In particular, the expert's report need not contain all the expert's ultimate conclusions. See, e.g., Pierce v. State, 786 P.2d 1255, 1262-63 (Okla. Crim. App. 1990). Mr. Cannon's trial counsel was not ineffective for failing to object to the testimony as "unfair surprise."

-12-

Second, Mr. Cannon contends that Dr. Hemphill's reference to certain wounds as "defense wounds" was improper ultimate-opinion testimony. Under Oklahoma law, "opinion testimony which merely tells a jury what result to reach is inadmissible." Romano v. State, 909 P.2d 92, 109 (Okla. Crim. App. 1995). But "expert witnesses can suggest the inference which jurors should draw from the application of specialized knowledge to the facts," id., and "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." 12 Okla. Stat. § 2704. Here, Dr. Hemphill explained why he inferred that certain wounds likely resulted from trying to ward off an attack. Such testimony is not barred by Romano. Failure to object to this testimony as an "ultimate opinion" did not constitute ineffective assistance of trial counsel.

### c. Necklace testimony

Mr. Cannon contends that trial counsel was ineffective because she failed to object to Dr. Hemphill's testimony that some of the victim's wounds could have been caused by a necklace. Mr. Cannon argues that because the necklace was never taken into custody by the police and because Dr. Hemphill saw only photographs of the necklace, his testimony was beyond the scope of his personal knowledge.

-13-

Dr. Hemphill was asked to explain what could have caused some injuries to the victim's neck. He answered:

> These are a type of blunt injury, so by definition, they're caused by a blunt or semi-sharp object being dragged across the skin. As to what could have done this, fingernails could do this. There was a small necklace found at the scene, which I was shown pictures of and told about, that could have conceivably caused some of these. The necklace was broken. If the assailant grabbed it, for example, and pulled or twisted it in anyway [sic], slipping around could have caused some of this.

Tr. at 874. We see no ground for proper objection to this testimony. Mr. Cannon does not dispute that a necklace had been found at the scene of the crime. Nor does he explain why the depiction of the necklace in the photograph provided an inadequate foundation for Dr. Hemphill to infer that it could have caused the injury. An expert may express an opinion based on factual evidence provided by others. See 12 Okla. Stat. § 2703.

### d.       Knowledge of the victim's body

Mr. Cannon argues that Dr. Hemphill lacked the personal knowledge necessary to testify in the case. On recross-examination Mr. Cannon's trial counsel asked Dr. Hemphill, "When this case was brought to you, what all did you know? Anything you haven't testified to?" Tr. at 891. Dr. Hemphill responded, "Well, I don't have an independent recollection. I can only tell you what my investigator had written out by the time I saw the body for the first time. . . ." Id. Mr. Cannon contends that this testimony demonstrates that Dr. Hemphill lacked

-14-

sufficient personal knowledge to form his opinion of the cause of death. We disagree. The quoted testimony related only to what Dr. Hemphill knew before examining the victim's body. It is clear from the record that Dr. Hemphill actually performed a medical examination that provided the basis for his testimony.

### e.  Time of death

Mr. Cannon argues that Dr. Hemphill's estimate of the period during which death occurred was inconsistent with the testimony of prosecution witnesses who placed him away from the murder scene during that period. Apparently he is contending that his counsel should have cross-examined Dr. Hemphill on this point. But the time of death was not a critical issue in the case (Mr. Cannon did not have an alibi defense) and the cross-examination of Dr. Hemphill was successful in several other respects. Decisions on how to question a witness are generally committed to counsel's discretion. See United States v. Snyder, 787 F.2d 1429, 1432 (10th Cir. 1986) ("Counsel's selection of questions is a matter of 'strategic choice,' as to which [s]he has broad latitude."). We hold that counsel's failure to cross-examine Dr. Hemphill regarding the time of death did not constitute ineffective assistance of counsel.

### f.  Closing argument

Mr. Cannon contends that counsel was ineffective for failing to object to statements made by the prosecution during closing argument as mischaracterizing Dr. Hemphill's testimony. As set forth earlier, Dr. Hemphill testified that cuts on the victim's hands were defensive wounds. On cross-examination, Mr. Cannon's attorney elicited that there could be other explanations for the cuts—that they could be consistent with Mr. Cannon's claim that he acted in self-defense. On redirect examination the prosecution asked: "[Defense] [c]ounsel asked you about possible causes of injuries. After you listened to her questions and you thought about your answers, is it still your best explanation within your training and experience, that it's still consistent, in your opinion, to classify the major wounds to her hands as defensive wounds?" Tr. 889-90. The doctor responded that he would still classify the wounds as "defensive wounds." Id. at 890.

During closing the prosecutor recounted this testimony. He stated: "[F]inally I had to stand up on redirect and say, well, [did] all those questions [the defense counsel asked] change your opinion one iota? [And the doctor answered] No." Id. at 928. Mr. Cannon seems to argue that this description mischaracterized the doctor's testimony. Although we agree that the prosecutor did not describe the testimony verbatim, his description was not cause for objection.

### 3.    Cross-examination of Sheena Elliott

Mr. Cannon argues that counsel rendered ineffective assistance by failing to cross-examine Sheena Elliott adequately. He points to inconsistencies between her preliminary hearing testimony and her trial testimony. We agree that several statements she made at the preliminary hearing were inconsistent with statements made at trial. Most notably, Ms. Elliott testified at the preliminary hearing that the last time she saw Ms. Clark alive was on Thursday, February 2, 1995; but at trial she testified that this occurred on Friday, February 3—the day of the homicide.

It is not, however, always the best trial strategy to exploit every inconsistency in the statements of a witness, even a witness called by opposing counsel. To some extent, Ms. Elliott's testimony was consistent with Mr. Cannon's defense and was referred to favorably in his counsel's final argument. Mr. Cannon has not shown that defense counsel's strategy with respect to cross-examining Ms. Elliott was so unreasonable as to constitute ineffective assistance of counsel.

### 4. Failure to impeach other prosecution witnesses and call a witness

Mr. Cannon argues that he received ineffective assistance of counsel because his trial counsel failed to impeach three other prosecution witnesses: Detective Fultz, Adrian Collins, and Betty Scott. He also suggests that trial counsel should have called the victim's mother to testify.

-17-

With respect to Detective Fultz, Mr. Cannon contends that the officer's conduct belied his trial testimony that he did not believe Mr. Cannon when Mr. Cannon gave his version of events in their telephone conversation. On February 16, over a week after he spoke with Mr. Cannon on the telephone and examined the homicide scene, Detective Fultz requested lab work to determine whether Mr. Cannon's blood was found at the scene. Mr. Cannon asserts that this request demonstrates that Detective Fultz was not as "solidly grounded in his opinion as he portrayed himself to be on February 7th." Aplt. Br. at 14. The contention is frivolous. An investigator's decision to pursue important evidence is hardly inconsistent with the investigator's belief in the strength of the evidence already obtained. There was nothing inadequate about trial counsel's failure to cross-examine on this matter.

Adrian Collins, a friend of Mr. Cannon's, testified that he drove Mr. Cannon to the bus station, and he identified a pair of bloody sneakers found in the victim's apartment as belonging to Mr. Cannon. Mr. Cannon asserts that trial counsel should have impeached Mr. Collins using his "extensive criminal record." But Mr. Cannon fails to provide sufficient information about that criminal record to determine whether impeachment would have been possible under the applicable Oklahoma rule of evidence, 12 Okla. Stat. § 2609 (allowing

-18-

impeachment by use of criminal convictions in certain situations).  Furthermore, it appears that Mr. Collins did not testify to anything worth impeaching.

Betty Scott, Mr. Cannon's mother, testified on various matters, including the telephone call from her son in Michigan after he had killed the victim. Mr. Cannon asserts that trial counsel should have impeached her by eliciting that she was in possession of a stolen cell phone.  We disagree.  Such a gratuitous attack on a client's mother is unlikely to be helpful.

Mr. Cannon also argues that "trial counsel should have called Sharonda Clark's mother, Phyllis Lacy[,] to testify as to a recent phone call she received from Sharonda in which Sharonda told her mother how happy she was in her relationship with Mr. Cannon."  Aplt. Br. at 14.  We observe, however, that such testimony may have undermined his theory that the victim was the aggressor. Moreover, expecting a mother to testify favorably for the defendant who admittedly killed her daughter would surely be risky trial strategy.

We reject Mr. Cannon's claim that his counsel was ineffective because of failure to cross-examine or call these witnesses for the purposes he suggests.

### 5.    Failure to introduce evidence

For his fifth claim of ineffective assistance, Mr. Cannon states only, "Trial counsel's failure to introduce evidence or reveal existence of evidence was

ineffective assistance of counsel in capital murder prosecution." Aplt. Br. at 15. In the absence of any further explanation of the claim, we must reject it.

### 6. Failure to consult (call) necessary experts

Mr. Cannon contends that trial counsel improperly failed to consult or call experts to assist at his trial. Stating that the only expert called by trial counsel was a doctor who testified during sentencing regarding future dangerousness, he argues that "[t]rial counsel should have sought the assistance of a neuropsychiatrist, blood-spatter expert, medical-examiner expert, and self-defense expert in order to present [his] defense." Id.

The doctor called by the defense to testify during sentencing was a neuropsychologist. It is not apparent to us, nor has Mr. Cannon indicated, what helpful testimony would, or even could, have been elicited by any of the additional experts he suggests. On this record we cannot say that trial counsel was ineffective for failing to engage additional experts. (Nor has Mr. Cannon provided any basis for ordering an evidentiary hearing on the matter.)

### 7. Failure to elicit and argue facts relevant to self-defense

Mr. Cannon states that "[e]vidence of Sharonda Clark's violent and aggressive tendencies, particularly towards men, though available was not presented." Id. at 16. Under 12 Okla. Stat. § 2404(a)(2), an accused may offer evidence of a pertinent character trait of the victim.

Nevertheless, Mr. Cannon has failed to show that any additional helpful testimony was available. In an affidavit he states: "Tamoura Cannon[] lived with Sharonda Clark and her husband, Kelly Clark[,] for a period of time. Ms. Cannon had personal knowledge of Sharonda Clark's violent tendencies toward her husband. This would have supported brief testimony of Agnes Clark *to the same effect*." Pro Se Application for Post Conviction Relief, Exh. 1 at 3 (emphasis added).

It is therefore worth reviewing Agnes Clark's testimony on the matter:

Q:      Okay. Was she [the victim] ever violent with you?

A.:     No.

Q:      Did you ever see her get into fights or arguments or be aggressive?

A:      Yes, once.

Q:      Okay. Describe that for us.

A.      Well, she was angry like anyone else, you know, angry, and had an argument, and that was it.

Q:      Did you ever see her anger draw her to come to blows with anyone or aggressively attack anyone because of her anger?

A:      Well, yes, I've seen her get mad. Yes, I've seen her get mad.

Q:      At who?

A.:     At her husband.

Q:      Would you characterize it as anything out of the ordinary?

A:    No.

Tr. at 710-11.  Additional testimony "to the same effect" would not have helped

Mr. Cannon.  We therefore reject this argument.

Mr. Cannon also asserts that trial counsel was ineffective for not offering

evidence that bruises on the victim's wrists were consistent with "[Mr. Cannon's]

grabbing her wrist while she possessed the knife in her hand."  Aplt. Br. at 16.

This evidence, he argues, would have been consistent with the victim's being the

aggressor and would have supported his claim of self-defense.  The record,

however, reveals no failure by defense counsel in this respect.  Trial counsel

vigorously cross-examined the medical examiner in an effort to get him to admit

that many of the victim's wounds were consistent with Mr. Cannon's theory of

self-defense.  In particular, trial counsel questioned the medical examiner about

whether bruises on the victim's forearm were consistent with Mr. Cannon's

grabbing her forearm.  During closing argument counsel said, "The external

circumstances that I see are a bruise right here, consistent with grabbing and

stopping Sharonda from attacking with a knife."  Tr. at 915.  Counsel appears to

have done exactly what Mr. Cannon claims she did not do.

Additionally, Mr. Cannon argues that trial counsel should have offered

evidence of cuts on Mr. Cannon's hands, which were consistent with defending

himself against someone with a knife.  But the officer who arrested Mr. Cannon

in Michigan testified that he did not see any injuries on Mr. Cannon's hands or anywhere on Mr. Cannon's body at the time of arrest. In an attempt to impeach the officer, trial counsel elicited testimony that the lights were dim during the arrest and that the officer's attention was focused elsewhere. She also made this point during closing argument. Mr. Cannon does not indicate what more his trial counsel could have done.

### 8. Failure to invoke the rule of sequestration

Mr. Cannon claims that trial counsel was ineffective because she failed to invoke the rule of sequestration, which prevents witnesses from being in the courtroom while other witnesses are testifying. This, he argues, "allowed the prosecution witnesses to sit and listen to each other testify and specifically craft their own testimony to prejudice [him]." Aplt. Br. at 21. Yet Mr. Cannon fails to allege which witnesses were present during other witnesses' testimony, making it impossible to determine whether there was good cause for the witnesses to be present (for example, the principal case agent is often permitted to be present at the counsel table to assist throughout the trial, see 12 Okla. Stat. § 2615 (providing rule of sequestration and listing exceptions); Dyke v. State, 716 P.2d 693, 697-98 (Okla. Cr. App. 1986) (construing statute to include case agent as exception to rule of sequestration)), or whether any prejudice could have resulted. There is no support for a claim of ineffective assistance on this ground.

## 9. Presentation of manslaughter defense

Mr. Cannon claims that trial counsel violated his constitutional rights by arguing a defense of manslaughter in addition to self-defense. Mr. Cannon asserts that he wished to argue only self-defense at trial but "[t]rial counsel, over repeated objections by Mr. Cannon[,] presented and argued a manslaughter defense against Mr. Cannon's will." Aplt. Br. at 24. He contends that inclusion of a manslaughter defense undermined his self-defense claim because the two are logically inconsistent. We disagree.

In his affidavit of January 27, 1999, Mr. Cannon stated:

> 4. In closing arguments trial counsel presented and argued a theory of manslaughter over the objections of the petitioner. Petitioner did not desire or wish that a theory of manslaughter be presented on his own behalf. Trial counsel was aware of Petitioner's desire and ignored it. Petitioner only desired that a theory of self-defense be argued on his own behalf. Trial counsel also included manslaughter in it[s] jury instructions over the objection of the petitioner. Petitioner was prejudiced by this act of counsel because the prosecution used it against the petitioner in closing arguments. This option wouldn't have been available if trial counsel hadn't presented it over petitioner[']s objections. There is such a thing as not guilty by reason of self-defense but there is no such thing as not guilty by reason of manslaughter.

> 5. By arguing a theory of manslaughter, trial counsel made an admission of guilt on petitioner's behalf. Trial counsel has no due authority to make any admission of guilt on behalf of the petitioner without petitioner[']s consent. . . .

Pro Se Application for Post Conviction Relief, Exh. 1 at 6.

-24-

Although self-defense is a complete defense to first-degree murder, justifying an acquittal, whereas manslaughter is only a lesser offense, the two theories are not contradictory or logically inconsistent. On the contrary, they are complementary. "It is the general rule that passion resulting from fright or terror may be sufficient to reduce a homicide from murder to manslaughter and such a killing may be closely akin to a killing in self-defense." See Wood v. State, 486 P.2d 750, 752 (Okla. Crim. App. 1971). A homicide may be found to be manslaughter when the killing was motivated by the defendant's belief that he was in great danger, "even if he was not warranted in such belief or where the slayer although acting in self-defense was not himself free from blame." Id. Thus, some courts and commentators refer to manslaughter as an "imperfect" self-defense—that is, although the defendant cannot satisfy all the elements of self-defense, he is less culpable because he can satisfy some of the elements. See 2 Wayne R. LaFave, Subst. Crim. L. § 10.4(i) (2d ed. 2003).

Trial counsel, by arguing both theories, essentially asked the jury to find self-defense, but if the jury could not do so, to find manslaughter. The argument did not concede Mr. Cannon's guilt in any fashion. Whether to argue a lesser-included offense is a matter to be decided by counsel after consultation with the defendant. See ABA Standards for Criminal Justice 4-5.2 Cmt. at 202 (3d ed. 1993) (omitting statement appearing in 1980 second edition that client decides

-25-

whether to seek submission to jury of lesser-included-offense instruction). We reject this claim of ineffective assistance.

### 10.    Right to proceed pro se

Mr. Cannon claims that trial counsel denied him the right to proceed pro se on direct appeal. A defendant has a constitutional right to represent himself, even if doing so would be detrimental to his defense. See Faretta v. California, 422 U.S. 806, 834 (1975). Mr. Cannon asserts that trial counsel was aware of his desire to proceed pro se on appeal but failed to inform the judge. The record reveals, however, that any failure by trial counsel in this regard did not cause him any prejudice. He had the opportunity to inform both the judge and appellate counsel of his desire to represent himself on appeal.

The following exchange occurred at sentencing on March 26, 1996:

The Court:        Are you ready for sentencing, Mr. Cannon?

Mr. Cannon:       Yes.

The Court:        Do you have anything to say before sentencing?

Mr Cannon:        No.

The Court:        Mrs. Conway, do you have anything to say before sentencing?

Mrs. Conway:      No, sir.

The Court:        All right. It will be the judgment of the Court that the defendant be sentenced to die by administration of intravenous injection and I will set the time for

-26-

sentencing, which is merely a formality, on the 23rd day of May, 1996, at midnight.

The public defender's office is hereby appointed to represent the defendant for purposes of appeal.

Mr. Cannon, do you have any funds with which to hire your own attorney?

Mr. Cannon:     Not at the moment.

The Court:      Well, do you have any relatives or anyone that plans on hiring your own attorney?

Mr. Cannon:     I haven't got to talk to them yet.

The Court:      You haven't got to talk to them yet.  Well in the meantime, I will appoint the Public Defender's Office here in Tulsa to represent you.  If you get money or if your family can get the money and can hire another attorney, so be it, but up until that time the Public Defender's Office is responsible for representing you for purposes of appeal.  Mr. Cannon, what is your birth date?

Tr. at 1240-41.  Mr. Cannon fails to explain why he could not have informed the judge of his desire to proceed pro se during the exchange regarding who would represent him on appeal.  Moreover, Mr. Cannon has not alleged that he informed appellate counsel of his desire to proceed pro se, yet almost two years elapsed between the date he was sentenced and the date his appeal was argued before the OCCA.

Mr. Cannon also contends that he filed timely applications to proceed pro se on direct appeal but he was denied the right to do so because the court clerk

mishandled his applications. The record belies this assertion. Whether the clerk mishandled his applications was of no consequence. Mr. Cannon's letters to the OCCA clerk were dated March 5, 1998, and March 11, 1998—approximately one month after his direct appeal had been heard at oral argument on February 10, 1998. Thus, his applications to proceed pro se on direct appeal were too late for any action by the OCCA.

Although Mr. Cannon asserts that he had previously sent a letter requesting to proceed pro se, he offers no specifics about that letter, such as when he sent it. Furthermore, other than an affidavit attached to his reply brief to this court, the record contains no reference to such a letter. Therefore, we can properly ignore this assertion.

**B. Claims with Possible Merit**

We now turn to two claims that may be meritorious. Mr. Cannon claims that trial counsel was ineffective for failing to notify the court of improper contact between prosecution witnesses and jurors during trial recesses, and for usurping his decision whether to testify in his own defense. The OCCA has never addressed the merits of either claim. Mr. Cannon did not raise the claims on direct appeal to the OCCA; and when he raised them in post-conviction proceedings, the OCCA held them to be procedurally barred because they had not been raised on direct appeal. As we proceed to explain, however, (1) each claim

has merit if Mr. Cannon's factual allegations turn out to be supported by persuasive evidence; (2) whether the claims are procedurally barred depends on findings that the district court must make on remand; and (3) if there is no procedural bar, Mr. Cannon is entitled to a hearing at which he can further develop evidence supporting his failure-to-testify claim and may be entitled to such a hearing on his improper-contact claim. We begin by discussing the merits of each claim, then procedural bar, and finally the propriety of an evidentiary hearing with respect to each claim.

### 1. Merits of the claims

### a. Improper juror contact

Mr. Cannon alleges that counsel was ineffective for failure to inform the court of improper contact between prosecution witnesses and jurors during trial recesses. His affidavit of January 27, 1999, submitted to the OCCA as part of his post-conviction collateral attack, states:

> 1. Trial counsel failed to take action or request a hearing concerning improper outside influences on the jury. Petitioner became aware that Larry Salzman, father of State witness Pam Salzman and himself an endorsed State witness, had improper contact with trial jurors during the trial. Petitioner believes in good faith that the following persons have actual knowledge that such contact did occur, that trial counsel was made aware of this improper contact, and failed to take proper steps to alert the court or remedy prejudicial influences upon the jury at trial.

2    Hamon Sallis, Lee Sallis, Betty Cannon, Tamoura Cannon, and Wade Johnson all witnessed improper contact between Larry Salzman and one or more of the trial jurors. These witnesses were also present when trial counsel was advised of the contact between Mr. Salzman and the trial jurors and would further corroborate Petitioner's testimony that trial counsel was aware of the improper contacts and did nothing. An evidentiary hearing is the only means necessary to discover the actual content of communications between Mr. Salzman and the jury and determine the extent of prejudice to petitioner.

3.    These same witnesses also saw State witness Awanna Simpkins communicate verbally with jurors during a recess, at which time Ms. Simpkins made a statement that Petitioner had raped her. These witnesses would also testify that trial counsel was aware of this improper contact between the witness and the trial jurors but failed to make a record of the incident before the court or take other measures to determine the impact of the communication on members of the jury. An evidentiary hearing is necessary to present this evidence and summon witnesses to testify concerning the prejudicial impact of these errors.

Pro Se Application for Post Conviction Relief, Exh. 1 at 4. Mr. Salzman was listed by the prosecution as a potential witness, although he did not testify. Ms. Simpkins testified during the trial's sentencing phase. In a pleading entitled "Request for Appointment of an Investigator" filed simultaneously with and referenced by his § 2254 application, Plaintiff supplemented the affidavit by stating that Ms. Simpkins' rape accusation occurred during the guilt phase of the

trial.  See Bryan v. Mullin, 335 F.3d 1207, 1214 (10th Cir. 2003) (en banc) (evidentiary hearing justified in part by allegations in habeas application).

If the allegations in Mr. Cannon's affidavit are true, he was likely rendered ineffective assistance of counsel, because of the probability that proof of such juror contact would have entitled him to relief from the trial court.  If trial counsel was in fact informed about improper juror communications and did nothing, such inaction would appear to satisfy Strickland's first prong.  As for Strickland's prejudice prong, in Remmer v. United States, 347 U.S. 227, 229 (1954), the Supreme Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

See United States v. Scull, 321 F.3d 1270, 1280 n.5 (10th Cir. 2003).  Although this court has declined to apply Remmer in a § 2254 proceeding to determine whether jury contact was prejudicial, see Crease v. McKune, 189 F.3d 1188, 1193 (10th Cir. 1999), that is not the issue before us.  The question here is not whether we would find that the contact was prejudicial but whether the state court would have found prejudice had trial counsel raised the issue.  If the state court had

applied Remmer to the facts alleged by Mr. Cannon, it very likely would have found prejudice. Unfortunately, there is no definitive Oklahoma decision adopting or rejecting Remmer. The only reference in reported Oklahoma cases to the Supreme Court decision is a case distinguishing, but not criticizing, Remmer. See Silver v. State, 737 P.2d 1221, 1224 (Okla. Crim. App. 1987). In this circumstance we believe the proper course is to assume that the Oklahoma court would have found Supreme Court authority to be persuasive, or, in any event, would have presumed prejudice here from an inflammatory allegation of rape and the other alleged improper communications.

Accordingly, if Mr. Cannon's assertions are true, he was likely prejudiced by his counsel's inaction. Whether Mr. Cannon has a meritorious claim will depend, however, on whether he is entitled to an evidentiary hearing on this claim and whether such a hearing elicits persuasive evidence supporting his assertions.

### b.       Right to testify

Mr. Cannon alleges that trial counsel would not allow him to take the stand in his own defense, despite his unequivocal expression of the desire to do so. The district court construed Mr. Cannon's allegations that he was denied the right to testify as an ineffective-assistance claim. Other courts also treat such claims as ineffective-assistance claims. See, e.g., United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992) (en banc) ("the appropriate vehicle for claims that the

defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel"). We agree that Mr. Cannon's claim is best treated as an ineffective-assistance-of-counsel claim and analyze it as such.

Mr. Cannon's affidavit to the OCCA states in relevant part:

1. In more than one pre-trial conference petitioner informed trial counsel that the petitioner wished to testify on petitioner's own behalf. Trial counsel was against this decision. Through the course of several pre-trial discussions concerning this issue petitioner would never relent or change his position and desire to testify on his own behalf. Trial counsel also refused to relent or change the position of being against petitioner's desire to testify on his own behalf. At the beginning of trial petitioner reiterated to trial counsel his desire to testify on his own behalf.

2. Upon petitioner[']s request to trial counsel to testify on his own behalf, trial counsel became enraged and abandoned [her] previous finesse technique and went to an aggressive bulldog approach and responded to petitioner, "Judge Hopper assigned me to represent this case and I am the captain of the ship and I make all decisions concerning this case and I say you're not going to testify, besides our witness list is already in and you are not on it so you couldn't testify anyway." Petitioner still maintained his wish to testify.

3. When the State rested it[ ]s case and the Judge called for the defense to present it[ ]s side, Petitioner started to fix his jacket to get ready to take the witness stand to testify on his own behalf. Trial counsel was well aware of the petitioner[']s wish to testify. In order to purposely sabotage and subvert petitioner's right to testify on his own behalf when the Judge called for the defense, trial counsel quickly sprang out of the chair and said that the defense rests in order to cut the petitioner off[,] full well

-33-

> knowing the petitioner couldn't afford an[] incident in front of the jury. Petitioner's grandparents, Hamon Sallis, Lee Sallis; sister Tamoura Cannon, Mother Betty Scott (note: State Witness) and friend Wade Johnson all had prior knowledge of Petitioner's wish to testify on his own behalf and would testify to such knowledge if called to do so by the court.

Pro Se Application for Post Conviction Relief, Exh. 1 at 5-6.

A criminal defendant has a constitutional right to testify in his own behalf at trial. Rock v. Arkansas, 483 U.S. 44, 49-52 (1987). The decision whether to testify lies squarely with the defendant; it is not counsel's decision. Jones v. Barnes, 463 U.S. 745, 751 (1983). Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him. See Teague, 953 F.2d at 1533-34. Counsel should also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant. See id. Yet counsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy. See United States v. Janoe, 720 F.2d 1156, 1161 & n.10 (10th Cir. 1983).

If Mr. Cannon's affidavit is true, then counsel deprived him of the constitutional right to testify in his own defense. Such a dereliction of duty by counsel would satisfy the first prong of Strickland.

-34-

As discussed above, <u>Strickland</u>'s second prong—prejudice—is established if there is a reasonable probability that defendant's testimony would have raised in a juror's mind a reasonable doubt concerning his guilt. <u>Strickland</u>, 466 U.S. at 694-95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. We recognize that the jury had already heard a recording of Mr. Cannon's account of Sharonda Clark's death in his telephone conversation with Detective Fultz. In light of the physical evidence and other testimony, the jury rejected Mr. Cannon's account. We can be skeptical that the jury's view would have been changed by hearing Mr. Cannon's live testimony, particularly in light of what could have been elicited on cross-examination.

Nevertheless, the recorded account was hardly seamless. The recording contains long periods of silence (perhaps from editing the tape) and the 22-page transcript contains 64 "inaudibles." Such interruptions in the narrative could impact its persuasiveness. We are also cognizant of the power of a face-to-face appeal. Most importantly, however, Mr. Cannon's testimony would be of particular relevance to the claim presented by his trial attorney that his acts constituted only manslaughter. Even when the objective evidence appears to preclude a self-defense claim, the jury might still harbor a reasonable doubt whether Mr. Cannon actually believed that he was in danger, <u>see</u> <u>Wood v. State,</u>

486 P.2d 750, 752 (Okla. Crim. App. 1971) (homicide may be found to be manslaughter where killing was motivated by defendant's "belie[f] that he was in great danger, even if he was not warranted in such belief or where the slayer although acting in self-defense was not himself free from blame"), or was aroused by passion, see Cipriano v. State, 32 P.3d 869, 874 (Okla. Crim. App. 2001) (listing elements of heat-of-passion manslaughter). Mr. Cannon's testimony, and his demeanor while testifying, could have special significance to the jury on this matter.

We conclude that the issue of prejudice is of sufficient doubt that it should not be resolved in the first instance by this court. On remand, resolution of the merits of the claim (which, of course, would not be necessary if the claim is procedurally barred) will require the district court to resolve factual disputes regarding whether Mr. Cannon's attorney actually prevented him from testifying and, if so, whether Mr. Cannon suffered the requisite prejudice. (Although the question is very close, we do not treat footnote 10 in the district court's opinion as dispositive on this point. The footnote recites the harm to Mr. Cannon that would have resulted from his testifying. The footnote does not, however, address whether his testimony would have been helpful on the manslaughter issue; nor does it state that absence of prejudice from not testifying is an alternative ground for the court's ruling. We note that the state's appellate brief makes no reference

to the footnote. In the circumstances, we think it prudent that our remand for further consideration include this issue as well as the jury-contact issue.)

### 2. Procedural bar

"On habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998). A procedural ground is "independent" if it is based on state, rather than federal, law. See id. at 1259 & n.2. That is indisputably the case here, where the OCCA refused to hear Mr. Cannon's ineffective-assistance claims because they had not been raised on direct appeal, as required by Oklahoma law.

For a state rule of procedural default to be "adequate," several conditions must be satisfied. To begin with, it "must be applied evenhandedly in the vast majority of cases." Id. at 1259. That is not an issue on appeal. In addition, however, a rule is not "adequate" to bar a claim of ineffective assistance of trial counsel:

> unless the state procedures comply with the imperatives set forth in Kimmelman [v. Morrison, 477 U.S. 365 (1986)]: (1) allowing petitioner an opportunity to consult with separate counsel on appeal in order to obtain an objective assessment of trial counsel's performance and (2) providing a procedural mechanism [on direct appeal] whereby a petitioner can adequately develop the factual basis of his claims of ineffectiveness.

English, 146 F.3d at 1263. We now address this two-part test, beginning with the requirement that "separate" counsel be available on appeal.

### a.    "Separate" counsel

As previously set forth, Mr. Cannon was represented at trial by two attorneys from the Tulsa Public Defender's office. He was represented on direct appeal by another attorney from the same office. Mr. Cannon argues that two attorneys who work in the same Public Defender's office cannot be considered "separate" counsel within the meaning of English. He further alleges that his appellate counsel had a policy of not arguing ineffective assistance of trial counsel in cases tried by the Public Defender's office.

Mr. Cannon's allegations raise serious concerns under English. The requirement that trial and appellate counsel differ derives from two considerations. First, a defendant, on his own as a layman, will "ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance." Kimmelman, 477 U.S. at 378. Second, a lawyer who renders ineffective assistance at trial will likely be hesitant to raise his own trial inadequacies on appeal, or even inform the client of any inadequacies.

That second consideration may still have force when distinct lawyers handle the trial and appeal but the two are professionally aligned. If a criminal defendant is represented by trial and appellate counsel from the same office,

appellate counsel's assessment of trial counsel's performance may be less than completely objective. An understandable, although inappropriate, regard for collegiality may restrain appellate counsel from identifying and arguing trial-attorney error. We note that two lawyers from the same private law firm are often treated as one for conflict-of-interest purposes. See Restatement (Third) of the Law Governing Lawyers § 123 & cmt. d (iv) (2000) ("Restatement") (discussing imputation of conflicts among affiliated lawyers and noting that the "rules on imputed conflicts and screening . . . apply to a public-defender organization as they do to a law firm in private practice in a similar situation"); Martinez v. Sullivan, 881 F.2d 921, 930 (10th Cir. 1989) (assuming that two law partners should be considered as one attorney for conflict-of-interest purposes). When an appellate attorney argues ineffective assistance of trial counsel, he is arguing that the trial attorney—who may have an office down the hall—"was not a reasonably competent attorney," Strickland, 466 U.S. at 687 (internal quotation marks omitted), and that trial counsel's representation was so bad that it was not within "the range of competence demanded of attorneys in criminal cases." Id. (internal quotation marks omitted). Arguing ineffective assistance with respect to a colleague's performance is saying that the performance was not only inferior, but unreasonable. These are indeed bold statements to make about a co-worker. Presenting an ineffective-assistance-of-counsel claim may well damage the

reputation of the trial attorney and the office for which both trial and appellate counsel work.

In our view, whether trial and appellate attorneys from the same "office" should be deemed "separate" counsel will turn on the specific circumstances. A statewide public defender's office with independent local offices, and perhaps even a distinct appellate office, would not raise the same concerns as when trial and appellate counsel work in adjacent rooms. Cf. Restatement § 123 & cmt. e (for conflict-of-interest purposes, lawyers who share office space may be considered conflicted). The culture of an office can also make a substantial difference. A history of raising ineffective-assistance claims could allay concerns.

Of particular importance here is the allegation that appellate counsel had a policy of not claiming ineffective assistance by public defenders at trial. Although Mr. Cannon has presented no sworn affidavit asserting the policy, the record is strongly suggestive. On direct appeal from Mr. Cannon's conviction, appellate counsel raised 24 issues—including six claims of plain error. See Cannon v. State, 961 P.2d at 846, 848, 849, 850, 854. Under Oklahoma law, plain errors are "errors which counsel failed to preserve through trial objection but which, upon appellate review, are clear from the record and affect substantial rights." Valdez v. State, 900 P.2d 363, 369 n.6 (Okla. Crim. App. 1995). Yet

appellate counsel failed to assert that trial counsel had been ineffective in not objecting to any of these allegedly plain errors.

Especially in light of what is at stake in a death-penalty case, and given appellate counsel's willingness to raise so many (24) other alleged errors, we find it striking that appellate counsel never argued that trial counsel had been ineffective for not objecting to a "clear" error that "affect[ed] substantial rights." Id. Often, even ordinarily, one would expect a claim of ineffective assistance to accompany a claim of plain error. See State v. Rhodes, 657 N.W.2d 823, 839 n.7 (Minn. 2003) (noting similarities between plain error and ineffective assistance and analyzing alleged errors under ineffective-assistance framework); State v. Hansen, 61 P.3d 1062, 1067 n.2 (Utah 2002) ("When a party fails to preserve an issue for appeal, we will nevertheless review the issue if the appealing party can demonstrate plain error or exceptional circumstances. The party may also assert ineffective assistance of counsel in failing to preserve the issue." (internal citations omitted)); State v. Crislip, 785 P.2d 262, 269 (N.M. App. 1989) (Hartz, J., concurring) ("Perhaps as a practical matter every reversal predicated on plain error is a consequence of ineffective assistance of counsel."); Morton Gitelman, The Plain Error Rule in Arkansas—Plainly Time for a Change, 53 Ark. L. Rev. 205, 217 n.66 (2000) ("abrogating the [plain error] doctrine in the criminal area may be even more compelling [than in civil cases] since any error that deprives a

defendant of due process can more properly be remedied by a claim of ineffective assistance of counsel"); 25 Ohio Jur. 3d Crim. Law § 59 (2003) ("The standard of prejudice required to be satisfied to establish ineffective assistance of trial counsel for failure to object at trial is far more solicitous of a defendant's rights than the plain error standard applicable to conduct not complained of, and it is possible to raise an ineffective assistance claim when the plain error standard precludes a direct challenge to such conduct."); Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, Criminal Procedure §11.10(d) & n.143 (2d ed. 1999 & Supp. 2004) ("courts have noted that the prejudice element of <u>Strickland</u> may be more readily satisfied than the . . . [comparable] component of the plain error standard"; citing cases).

On the record before us, we would have to conclude that Mr. Cannon's trial and appellate counsel were not "separate" within the meaning of the word in <u>English</u>. On remand, however, the district court may grant the State an evidentiary hearing that could establish otherwise.

**b.    Claim resolved on trial record**

Besides requiring "separate" counsel for trial and appeal, <u>English</u> also states that Oklahoma's procedural bar to ineffective-assistance claims is adequate only if either (1) the claim could have been resolved based on the trial record alone, or (2) there existed at the time of direct appeal an adequate procedure to

remand specific claims to the district court for supplementation of the record. English, 146 F.3d at 1263-64. The district court ruled that English was satisfied with respect to Mr. Cannon's ineffective-counsel claims. Specifically with respect to the claim that Mr. Cannon was denied the right to testify, the court said that the claim "can be resolved upon the trial record alone. The trial record reveals that Petitioner did not testify on his own behalf[.] . . . [The] issue[] could have been raised on direct appeal without additional fact-finding[.]" R. doc. 81 at 22 (citation omitted). We have a different view.

An out-of-courtroom communication to a juror would ordinarily not be reflected in the trial record. Nor would any discussion between Mr. Cannon and his attorney about testifying. The record reflects only that Mr. Cannon did not testify. It states nothing about who made the decision that he would not testify. Additionally, the state trial judge did not ask Mr. Cannon whether he wished to testify. Certainly, Mr. Cannon knew at the time of direct appeal that he had these claims. But the OCCA could not have resolved the issues based on the trial record alone.

Accordingly, Mr. Cannon's claims could not be procedurally barred unless Oklahoma had in place at the time of his appeal a procedure allowing supplementation of the record. See, e.g., English, 146 F.3d at 1264-65. To rely on procedural bar, the State must establish on remand that Oklahoma law at the

time of Mr. Cannon's direct appeal would have allowed him to supplement the trial record with evidence to support his claims that counsel improperly failed to inform the court of outside juror influence and that he was denied the right to testify.

Of course, even if the district court determines on remand that Mr. Cannon's claims are not procedurally barred, he is not necessarily entitled to relief. A finding of no procedural bar means only that his claims are properly before the court. He must still prove that the claims are meritorious. We now consider whether Mr. Cannon is entitled to an evidentiary hearing to establish the truth of his allegations.

### 3.    Evidentiary hearing

The enactment of AEDPA in 1996 restricted the authority of federal courts to grant evidentiary hearings in habeas cases. Under the pre-AEDPA standard, a habeas petitioner was entitled to an evidentiary hearing in federal court if (1) "the facts were not adequately developed in the state court, so long as that failure [was] not attributable to the petitioner," Medina v. Barnes, 71 F.3d 363, 369-70 (10th Cir. 1995), and (2) "his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." Bryan v. Mullin, 335 F.3d 1207, 1214 (10th Cir. 2003) (en banc) (internal quotation marks omitted).

AEDPA changed the standard. It provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

**(A)** the claim relies on–

**(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

**(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and

**(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). If the prisoner did not "fail[] to develop the factual basis of [his] claim in State court, § 2254(e)(2) is not applicable and a federal habeas court should proceed to analyze whether a[n evidentiary] hearing is appropriate or required under pre-AEDPA standards." Bryan, 335 F.3d at 1214 (internal citations and quotation marks omitted).

We agree with the district court that Mr. Cannon has not satisfied the AEDPA requirements set forth in § 2254(e)(2)(A) or (B). To determine whether

pre-AEDPA standards apply, we must review whether Mr. Cannon was diligent in trying to develop the factual record in state court.

The Supreme Court stated in Williams that "[d]iligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information at the time, to investigate and pursue claims in state court."  529 U.S. at 435.  In prior cases in which the issue was raised, we have said that requesting an evidentiary hearing was sufficient to constitute diligence.  See, e.g., Boyd v. Ward, 179 F.3d 904, 925 & n.10 (10th Cir. 1999); Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998).  But we have never stated a categorical rule that requesting an evidentiary hearing in state court ipso facto satisfies the diligence requirement.  Indeed, the Supreme Court said in Williams, "Diligence will require in the usual case that the prisoner, *at a minimum*, seek an evidentiary hearing in state court in the manner prescribed by state law."  529 U.S. at 437 (emphasis added).  AEDPA speaks of failure "to develop the factual basis of a claim."  An evidentiary hearing is not the only means to accomplish that task.  We have not had occasion in our prior opinions to address whether an applicant has demonstrated a lack of diligence in pursuing a claim by failing to utilize a means other than a hearing to develop the facts.

But a sister circuit has. In <u>Dowthitt v. Johnson</u>, 230 F.3d 733, 758 (5th Cir. 2000), the Fifth Circuit held that sometimes diligence requires obtaining pertinent affidavits. The court wrote:

> Dowthitt argues that he exercised due diligence because he requested evidentiary hearings in state habeas proceedings, and those requests were denied. Thus, he asserts that his failure to develop his habeas claims are excused under § 2254(e)(2). We do not agree. Mere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim. As the state habeas court found, Dowthitt did not present affidavits from family members and did not show that they "could not be obtained absent an order for discovery or a hearing." In response, Dowthitt now argues that his "proffers" of what would be presented at a hearing constituted due diligence. We do not find his argument persuasive. Given that the family members were willing to testify at a hearing, Dowthitt could have easily obtained their affidavits. A reasonable person in Dowthitt's place would have at least done as much. Dowthitt's arguments that lack of funding prevented the development of his claims are also without merit. Obtaining affidavits from family members is not cost prohibitive. Thus, Dowthitt has not rebutted the state habeas finding in this regard.

<u>Id.</u>

We share the Fifth Circuit's view. The federal district court should not be required to conduct an evidentiary hearing on a claim when the applicant for relief has not presented evidence that would be readily available if the claim were true. We now proceed to address whether Mr. Cannon established the necessary diligence.

**a.      Juror contact**

-47-

The allegations regarding improper juror contact contained in Mr. Cannon's affidavit are all hearsay. The affidavit references no first-hand knowledge of any improper contact between witnesses and jurors. It states that family members and friends of Mr. Cannon have actual knowledge of the underlying events, and that they would testify to that knowledge at an evidentiary hearing. Yet Mr. Cannon has not included affidavits by any of these family members or friends. A diligent person would have done as much, absent an impediment preventing him from doing so.

Whether or not there was an impediment, however, was not litigated below. The district court did not make an explicit finding of fact regarding Mr. Cannon's diligence. We therefore remand to the district court the question whether Mr. Cannon was diligent in trying to develop the facts underlying his juror-contact claim. The court may take further evidence and may, in its discretion, conduct a hearing on the matter. If the district court determines that Mr. Cannon was diligent, he should be granted an evidentiary hearing on the merits of his juror-contact claim (if it is not procedurally barred).

### b.    Right to testify

Mr. Cannon's affidavit, in which he alleges trial counsel usurped his decision whether to testify, provides a first-hand account of events based on his own personal knowledge. The only people who know the truth of Mr. Cannon's

allegations are Mr. Cannon and his trial counsel. Mr. Cannon requested an evidentiary hearing on this issue in state court. We cannot see what more he could have done to pursue development of the record. Hence, he satisfies the diligence requirement. Under pre-AEDPA law he is entitled to an evidentiary hearing regarding the merits of the issue.

In sum, we reverse and remand with respect to Mr. Cannon's claims that he was denied effective assistance of counsel when counsel (1) failed to notify the court of improper juror contact and (2) prevented him from testifying at trial. Whether Mr. Cannon will ultimately prevail on either claim will depend on such matters as whether his claims are procedurally barred, whether his evidence in support of the claims is persuasive, and whether he is entitled to an evidentiary hearing to develop further evidence. We leave to the discretion of the district court the most efficient method of proceeding.

### C. Alleged Ineffectiveness of Appellate Counsel

Finally, Mr. Cannon asserts that his appellate counsel was ineffective for failing to pursue on appeal the claims he now raises regarding ineffectiveness of trial counsel. Of course, appellate counsel is hardly ineffective for failure to pursue meritless claims, see Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999); so we need address only the failure to pursue the two ineffective-trial-counsel claims that we have already said may have merit.

-49-

With respect to those two trial-counsel claims, however, we are remanding to the district court for further proceedings that may moot the ineffective-appellate-counsel claims if the district court resolves the trial-counsel claims on the merits (either denying relief because they do not have merit or granting relief because they do). Therefore, we remand the corresponding two ineffective-appellate-counsel claims for further consideration by the district court.

## IV. CONCLUSION

We AFFIRM the district court's judgment in all respects except that we REMAND to that court the issues whether Mr. Cannon is entitled to relief (1) because his trial attorney (a) failed to inform the court of improper juror contact or (b) denied him the right to testify in his own defense, or (2) because his counsel on direct appeal failed to pursue these two claims of ineffectiveness of trial counsel. The issues before the district court will be procedural bar, Mr. Cannon's diligence in pursuing the factual development of his juror-contact claim in state court, the merits of Mr. Cannon's contentions, and whether any violation of Mr. Cannon's constitutional rights was harmless. Resolution of some issues may moot others, so we leave to the district court's discretion the manner in which to proceed.

No. 03-5008, <u>Jemaine Monteil Cannon v. Mike Mullin</u>

**KELLY,** Circuit Judge, concurring in part and dissenting in part.


I concur in the court's opinion, with three exceptions. We recently noted that:

> District courts are entitled to some latitude with regard to evidentiary hearings, and the standard is higher than notice pleading. District courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a movant's claim.

<u>United States v. Cervini</u>, – F.3d–, –, No. 03-6144, 2004 WL 1790026, at *5 (10th Cir. Aug. 11, 2004). Remanding this case is completely inconsistent with these principles–the court remands for an evidentiary hearing on claims that were not presented to the federal district court, or not presented and supported adequately.

I. Failure to Testify

I would reject (on the merits) the ineffectiveness claim based upon Mr. Cannon's failure to testify. As the district court held, Mr. Cannon cannot show prejudice. Mr. Cannon's theory of self defense was presented to the jury based upon his own account (the recording) and a hearsay account by his mother. Tr. 669-81. As noted by the district court,

> Although the Court finds this issue is procedurally barred, a review of the record reveals that Petitioner would not have benefitted, indeed would have been seriously harmed, by testifying on his own behalf. Had he testified, the prosecution could have emphasized the deficiencies in Petitioner's "self defense" story. Cross examination would most likely have exposed the facts that Petitioner was a prison

escapee at the time of the murder, that he was previously convicted of a violent crime against a former girlfriend, that he suffered only minor injuries, if any, during the incident in question while the victim suffered multiple, fatal stab wounds, and that his victim was only 5'5" tall, 125 pounds while Petitioner is over 6' tall.

R. Doc. 81 at 21 n.10. Mr. Cannon never explained how his testimony would have differed from the account presented to the jury and how it would have countered the items mentioned by the district court. Mr. Cannon does not argue that his testimony was necessary for a manslaughter defense–to the contrary, Mr. Cannon argues that trial counsel was ineffective for presenting a manslaughter defense against Mr. Cannon's will. See Ct. Op. at 24-26.

This court remands the prejudice inquiry because (1) the quality of the tape and transcript may have affected its persuasiveness, (2) the court is cognizant of the power of a face-to-face appeal, (3) Mr. Cannon's testimony would be pertinent to the manslaughter defense that Mr. Cannon does not want, and (4) the district court's discussion concerning the likely harm of Mr. Cannon testifying (a) does not address the manslaughter defense, (b) does not explicitly state that the absence of prejudice from not testifying is an alternative ground for its holding, and (c) is not referenced by the state's appellate brief. None of these reasons are persuasive.

First, the court simply has given us no facts that were likely to be adduced by Mr. Cannon's testimony that were not already before the jury given the

-2-

recording and the hearsay testimony of his mother. The court's statement that the recording and transcript may not have been persuasive because of the technical quality of the recording is pure speculation. It is far more likely that the jury rejected Mr. Cannon's defenses given the victim's severe injuries and the lack of any serious injury to Mr. Cannon. It is not enough to note the power of a face-to-face appeal without placing that appeal in the context of the troubling facts and searching cross-examination that would followed Mr. Cannon's direct testimony. The prejudice inquiry must be made based upon the whole record, and what has been presented simply does not establish a reasonable probability that the outcome in this case would have been different.

Relying upon the possible benefit of Mr. Cannon's testimony to a manslaughter defense, as the court does, is completely improper. Mr. Cannon has taken the position in these proceedings that he does not want a manslaughter defense. The fact that we hold that counsel was not ineffective for presenting such a defense cannot undo Mr. Cannon's insistence, which would surely be urged at any retrial in which he might testify. See Pro Se Aplt. Br. at 22 ("Mr. Cannon would like the court to note that Mr. Cannon firmly asserts a claim of self defense."), 25 ("There can be a finding of not guilty by reason of self-defense but there is absolutely no such thing as not guilty by reason of manslaughter.").

The district court was hardly required to address whether Mr. Cannon's testimony would have been helpful on the manslaughter defense given Mr. Cannon's disavowal of that defense and his understandable failure to rely on it (both at the district court and this court) in presenting this claim. The only reasonable reading of the district court's conclusion that Mr. Cannon would not have benefitted and indeed would have been harmed by his own testimony is that Mr. Cannon was not prejudiced. That the district court did not identify its discussion as an alternative holding is hardly surprising because it is so obvious–after reciting that the claim was procedurally barred, the district court then explained that it had reviewed the record and what its conclusions were–this is a merits-based holding in the alternative. The fact that the state's appellate brief does not rely on the district court's alternative holding is of no moment–the state argues that Mr. Cannon's arguments on appeal are new and that these claims are procedurally barred. Regardless, we are bound to review the district court's opinion supporting the judgment, regardless of whether the parties rely upon it.

II.    Improper Juror Contact

Insofar as the ineffectiveness claim based upon improper juror contact, I would reject it as procedurally barred. The claim either was not fairly presented in its entirety to the OCCA or not developed adequately before the OCCA or the federal district court. The district court summarily rejected this claim based upon

Mr. Cannon's failure to provide supporting facts, argument and authority. Doc. 81 at 19.

Mr. Cannon's affidavit to the OCCA alleges "improper contact" between Larry Salzman, who did not testify, and one or more "trial jurors" and that sentencing phase witness Awanna Simpkins told the jurors at a recess that Mr. Cannon had raped her. The "improper contact" ground is nothing but a conclusion devoid of specifics about who, where, when and what. As to the second ground, Ms. Simpkins did indeed testify "He [Mr. Cannon] raped me," in the sentencing phase. Only in his federal petition did Mr. Cannon claim that the Simpkins "he raped me" comment came in the guilt phase. Thus, Mr. Cannon did not fairly present this claim (with its focus on the guilt phase) to the state court; it is unexhausted and procedurally defaulted. See Picard v. Connor, 404 U.S. 270, 276 (1971) ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). Mr. Cannon has not shown cause and prejudice or a fundamental miscarriage of justice that would excuse this default. See Murray v. Carrier, 477 U.S. 478, 485, 495 (1986).

Moreover, having named five witnesses to the improper contacts, I agree with this court that Mr. Cannon should have provided affidavits to the OCCA on post-conviction. Certainly by the time he filed his federal petition, they should have been provided if he expected an evidentiary hearing. Federal courts are not

required to hold hearings (even if a petitioner was diligent) without some idea of why the petitioner would be entitled to relief. Cervini, – F.3d at –, 2004 WL 1790026 at *5. This means a description of the facts (even if contested) that would entitle the petitioner to relief. Where the record has not been developed, the burden is on the petitioner to demonstrate that he (1) was not at fault for failing to develop the state court record or (2) meets the conditions of 28 U.S.C. § 2254(e)(2); if this burden is not met, the district court should not hold an evidentiary hearing. See Holland v. Jackson, 124 S.Ct. 2736, 2738 (2004). Because Mr. Cannon has not explained how he satisfies these conditions, I would not remand the diligence issue to the district court.

C. Remmer Presumption

Finally, the Remmer presumption the court suggests that the OCCA would apply to the improper juror contact claim is a rule of federal criminal procedure, not federal constitutional law, and this court has declined to apply it in the habeas context. Vigil v. Zavaras, 298 F.3d 935, 941 n.6 (10th Cir. 2002); Crease v. McKune, 189 F.3d 1188, 1193 (10th Cir. 1999). Although the OCCA rejected the improper juror contact claim on the basis of procedural bar and we are analyzing the merits for the first time, Mr. Cannon should not be aided by a presumption that is a matter of federal criminal procedure. Though the OCCA once cited Remmer and then distinguished it, Silver v. State, 737 P.2d 1221, 1224 (Okla. Ct.

Crim. App. 1987), that hardly suggests that the OCCA would adopt such a categorical rule given our treatment of it in the habeas context and its dilution or abrogation in the federal context. See United States v. Scull, 321 F.3d 1270, 1280 n.5 (10th Cir.) ("We note that this circuit and others have questioned the appropriate breadth of Remmer's presumption of prejudice rule, postulating the standard should be significantly narrowed, or replaced altogether."), cert. denied, 124 S. Ct. 175 (2003); United States v. Sylvester, 143 F.3d 923, 933-34 (5th Cir. 1988) (concluding that Remmer presumption has not survived).