**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 12, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARLOS TOVAR MENDOZA,

      Petitioner-Appellant,

v.

TIMOTHY HATCH, Warden;
ERASMO BRAVO, Warden,
Guadalupe Correctional Center;
ATTORNEY GENERAL FOR THE
STATE OF NEW MEXICO,

      Respondents-Appellees.

No. 09-2145

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 6:CIV-05-01303-BB)**

---

Kari Converse, Assistant Federal Public Defender, (Alonzo J. Padilla, Assistant
Federal Public Defender, with her on the briefs), Office of Federal Public
Defender, Albuquerque, New Mexico, for Petitioner-Appellant.

Margaret McLean, Assistant Attorney General (Gary K. King, Attorney General,
with her on the brief), Santa Fe, New Mexico, for Respondents-Appellees.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY,** Circuit Judge, **MELGREN**,
District Judge.[*]

---

    [*] The Honorable Eric F. Melgren, United States District Judge, District of
Kansas, sitting by designation.

**BRISCOE**, Chief Judge.

Petitioner Carlos Tovar Mendoza (Tovar), a New Mexico state prisoner, appeals from the district court's denial of his 28 U.S.C. § 2254 habeas petition. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the judgment of the district court and remand with instructions to conditionally grant Tovar's petition, subject to the State of New Mexico allowing Tovar to withdraw his no contest plea and proceed on the criminal charges against him.

I

*The underlying facts*

Tovar and his wife, Lilia, both originally from Chihuahua, Mexico, moved to Albuquerque, New Mexico, in 1987. Tovar was arrested on federal marijuana charges in 1999, and was subsequently convicted and sentenced to 46 months' imprisonment. While Tovar was serving his federal sentence, Lilia obtained a divorce.

Tovar was released from federal custody in July 2002 and moved back to Albuquerque, where he resided with his mother. Shortly thereafter, Tovar resumed an intimate relationship with Lilia and proceeded to spend a substantial amount of time with her and their three children. Tovar "had a key to Lilia's house and would, on occasion, work there building furniture." ROA, Vol. 1 at

2

451.

"At around 11:30 pm on October 8, 2002, Lilia's neighbor, Mark Bruening (Bruening) heard screaming in the street outside his house." Id. "Bruening went outside and saw Tovar fighting with someone in Lilia's red Pontiac, but he could not make out who the other person in the red Pontiac was." Id. "When Lilia had not returned to her house by the next morning, Bruening and another friend went to Tovar's apartment," observed Lilia's car parked there and saw blood inside of it, and "called the police." Id. "The police arrived at Tovar's apartment and, after viewing blood on items inside Lilia's car, entered the apartment and arrested Tovar." Id. Lilia was found inside Tovar's apartment badly beaten.

Lilia was taken to the hospital where she was interviewed by the police. Lilia provided the police with a recorded statement indicating that, "while she was in her car, Tovar walked up to her, pushed her, and removed her car keys." Id. According to Lilia, Tovar "then got into her vehicle, . . . began beating her," and "accused her of sleeping with another man . . . ." Id. Lilia stated that Tovar took her, "against her will, to an area near the river," where "[h]e continued to beat her and she jumped into the river." Id. Lilia indicated that the incident ended with "Tovar . . . help[ing] her out of the water and t[aking] her back to his mother's apartment." Id.

During the police interview at the hospital, Lilia made no mention of being raped by Tovar. Nor do the hospital records "indicate that Lilia reported being

3

raped." Id. However, approximately ten days later, on October 18, 2002, Lilia informed the lead prosecutor during the grand jury proceedings "that she had been sexually assaulted in the back seat of her car by Tovar on the evening of October 8, 2002." Id. at 451-52.

*The state criminal proceedings*

On October 18, 2002, a grand jury in Bernalillo County, New Mexico "indicted Tovar for first degree kidnaping, second degree criminal sexual penetration (CSP), and aggravated battery against a household member." Id. at 444-45. Tovar was initially represented by attorney Matthew Torres. "Tovar, however, became unhappy with Mr. Torres' [sic] representation and, upon [Tovar's] request, his family hired Anthony Ayala." Id. at 445. "Ayala entered his appearance on February 25, 2003." Id.

"The first communication that Tovar had with . . . Ayala was on the telephone while [Tovar] was incarcerated." Id. at 453. "During this five or six minute telephone conversation, . . . Ayala explained [that] Tovar['s] . . . sister had hired him, that he had special influence to call the jail, that he was friends with [the state district judge presiding over the case], and that he had [previously] made deals with [that judge]." Id.

On March 13, 2003, the deputy district attorney sent a plea offer letter to Ayala. Less than two weeks later, on March 25, 2003, the parties appeared before the state district court for a plea hearing. Immediately prior to that hearing,

4

Tovar met Ayala in person for the first time "in a small room next to the courtroom." Id. Tovar's "sister and mother were present at this meeting." Id. During the meeting, "Ayala again explained to Tovar that he was friends with [the judge] and that, because of his influence with the judge, he was the only attorney that could meet in the room adjacent to the courtroom." Id. Ayala further "explained to Tovar that [the judge] was in agreement with a three-year sentence." Id. At the ensuing plea hearing, Ayala repeatedly attempted on behalf of Tovar to enter a plea of no contest to the pending charges. "[T]he assistant district attorney," however, "was not prepared to go forward with a no contest plea without first consulting with his supervisor and the alleged victim." Id. at 445.

On April 4, 2003, Tovar met in person with Ayala immediately prior to the second plea hearing. The meeting occurred in the courtroom, with Tovar sitting in the jury box. Ayala gave Tovar a copy of the proposed "plea agreement, which was in English, and instructed him to sign it for a three-year sentence." Id. at 453. Tovar, a native Spanish speaker, cannot read English and, thus, was unable to read the plea agreement. Ayala did not translate the plea agreement into Spanish nor did he explain to Tovar the significance of the plea agreement.

On April 11, 2003, an information was filed in the same state criminal proceeding charging Tovar with an additional count of second degree CSP. "This charge related to an incident" involving Tovar and Lilia that allegedly occurred

5

on September 4, 2002.  Id. at 446.  According to Lilia, she went to the hospital on the evening of September 4, 2002, and reported being raped by [Tovar] earlier that day."  Id. at 452.  Lilia "was interviewed by hospital staff and a Sexual Assault Nurse's Examination was conducted."  Id.  "The medical records do not indicate any type of trauma or injury to Lilia."  Id.  "Lilia was advised to contact law enforcement if the crime was to be investigated."  Id.  "No police report was ever filed regarding the September incident."  Id.  "Although it is unclear from the record when Lilia reported the September incident to prosecutors, it was sometime before the March 13, 2003 plea offer letter to Mr. Ayala, and, presumably, after the October 18, 2002 grand jury proceedings."  Id.

On April 14, 2003, the state district court held a third plea hearing, during which Tovar signed "a Repeat Offender Plea and Disposition Agreement."  Id. at 445.  Under the terms of that agreement, Tovar "pled no contest to" all of the pending charges, id., and "faced a potential incarceration of up to thirty years," id. at 446.  At the hearing, the state district judge "reiterated the terms of the plea agreement," telling Tovar, "the bottom line is, I can sentence you anywhere from 0 to 30 years in prison."  Id. (internal quotation marks omitted).  Through an interpreter, Tovar stated under oath "that he understood [the potential sentencing range], that no one had promised him anything that was not contained in the plea agreement, that the plea agreement had been interpreted for him, that no one had forced him to enter the plea, that he was entering the plea under his own free will,

6

and that he was satisfied that the agreement was in his best interest." Id. Notably, however, "Ayala stood beside Tovar [throughout the hearing] and instructed [Tovar] as to how to respond to each of [the judge's] questions." Id. at 453-54. Further, when the state district judge asked the assistant district attorney to outline the factual basis for the plea, Ayala stated, "We'll stipulate that there is a factual basis, Your Honor." Id. at 446 n.4.

The presentence report that was subsequently prepared for Tovar noted, in pertinent part: "In the present offense, the defendant states that he did not kidnap or sexually penetrate the victim. He claims that the victim lied; he stated, 'she knows what happened.'" State ROA, Doc. 37, Exh. 6 at 3. Tovar appeared for sentencing on July 1, 2003. During the sentencing hearing, "Lilia testified that on the evening of October 8, 2002, Tovar battered her and took her, against her will, to an area near the river where he raped her in the back seat of her car." Id. at 446-47. Tovar attempted to deny these allegations, telling the state district court, "This time I didn't do anything." ROA, Vol. 1 at 447. The state district court rejected Tovar's assertions and sentenced Tovar to a term of imprisonment of twenty-five years, to be followed by five years of supervised probation.

Because the terms of his plea agreement expressly precluded him from doing so, Tovar did not file a direct appeal.

*The state postconviction proceedings*

On December 15, 2003, "Tovar filed a pro se state petition seeking habeas

7

relief on a number of grounds that he grouped under two headings: 'involuntary and unknowing plea' and 'ineffective assistance of counsel.'" Id. at 448. With regard to the first claim, Tovar alleged that Ayala "promised him" that, as a result of a purported "side agreement" Ayala had with the state district judge, he "would receive a three-year sentence." Id. Tovar further alleged that he "never read his plea transcript in Spanish and that [Ayala] first showed it to him while he was sitting in the jury box" awaiting entry of his plea. Id. As for his second claim, Tovar alleged that Ayala "failed to investigate obvious inconsistencies that would have proved [Lilia] had lied about being raped." Id.

Approximately five months after filing his state petition, Tovar moved to compel the State to respond. The state district court granted the motion and simultaneously appointed counsel to represent Tovar. However, approximately eight months later, the state district court summarily dismissed Tovar's petition without an evidentiary hearing and without the state having filed a response. The state district court's opinion stated, in its entirety: "The Petitioner freely and voluntarily entered this plea with full knowledge of the consequences. The Court, as reflected in the transcript, clearly established that Mr. Tovar understood and wanted the agreement." Id. at 448-49 (internal quotation marks omitted).

Tovar filed a petition for writ of certiorari with the New Mexico Supreme Court. On November 15, 2005, the New Mexico Supreme Court summarily denied Tovar's petition.

8

Tovar initiated these proceedings on December 14, 2005, by filing a federal habeas petition pursuant to 28 U.S.C. § 2254. Tovar's federal habeas petition was substantially similar to his state habeas petition, i.e., it alleged that his plea was involuntary and that Ayala provided ineffective assistance. The case was referred to a magistrate judge who recommended that an evidentiary hearing be conducted on Tovar's claims.

On April 16, 2007, the district court adopted that recommendation and ordered that an evidentiary hearing be held on Tovar's federal habeas petition. The district court concluded that "[b]ecause [Tovar] diligently attempted to develop the factual basis for his claims in accordance with New Mexico law, [28 U.S.C.] § 2254(e)(2) d[id] not apply." Id. at 174. More specifically, the district court noted that Tovar attached several affidavits to his pro se state habeas that "contained factual evidence to support [Tovar]'s involuntary and unknowing plea claim, as well as his failure to investigate claim." Id. at 173. The district court in turn applied the pre-AEDPA standard, which provides that a state habeas petitioner "is entitled to an evidentiary hearing in federal court when 'his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief.'" Id. at 174 (quoting Cannon v. Mullin, 383 F.3d 1152, 1175 (10th Cir. 2004)). The district court noted, in doing so, that Tovar's claim that his no contest plea was involuntary and unknowing was "supported by

9

an allegation that his attorney promised him he would receive a three year sentence" based upon "a side agreement [Tovar's counsel had] with the [state district] judge." Id. at 175. Moreover, the district court noted that, although "[t]he voluntariness of a plea 'can only be determined by considering all of the relevant circumstances surrounding it,'" id. (quoting Brady v. United States, 397 U.S. 742, 749 (1970)), the state court record did not "completely contravene[]," id., and indeed "'cast no real light' on" Tovar's allegations, id. (quoting Machibroda v. United States, 368 U.S. 487, 494-95 (1962)). The district court also acknowledged the similarity between Tovar's allegations and those addressed by the Supreme Court in Blackledge v. Allison, 431 U.S. 63, 65-71 (1977). In particular, the district court noted that both cases involved a plea which was allegedly induced by an unkept promise. Lastly, the district court noted the Supreme Court's admonition in Blackledge that a plea or sentencing record, "although imposing" for a petitioner seeking to challenge whether his plea was knowing and voluntary, "is not invariably insurmountable." 431 U.S. at 74.

The magistrate judge conducted a two-day evidentiary hearing on April 1-2, 2008. Eleven witnesses testified, including Tovar, the assistant district attorneys involved in the prosecution of Tovar, and three members of Tovar's family. Ayala did not appear as a witness. According to the record, the state contacted Ayala about the possibility of testifying, but Ayala declined on the grounds that he was the "target of a criminal investigation . . . ." Aplt. Br., Att. E at 4.

10

On June 16, 2008, the magistrate judge issued a report and recommendation recommending that Tovar's petition for writ of habeas corpus be granted. In her report, the magistrate judge first concluded that the deferential AEDPA standards of review were inapplicable because the federal court evidentiary hearing resulted in material factual findings not considered by the New Mexico state courts. Then, applying the longstanding test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984), the magistrate judge concluded "that . . . Ayala's performance fell below an objective standard of reasonableness" because he "failed to explain the significance of the plea agreement and recklessly promised Tovar that he had an agreement with [the state district judge] for a three-year sentence,"[1] ROA, Vol. 1 at 459, and "that Tovar ha[d] sufficiently demonstrated that, but for . . . Ayala's error, there [wa]s a reasonable probability that he would not have pleaded guilty and [would instead have] insisted on going to trial," id. at 460.[2] The magistrate judge also concluded "that Tovar's plea was involuntary as a result of . . . Ayala's failure to investigate." Id. at 461. More specifically, the magistrate judge concluded that "Ayala's decision to end his investigation was not consist[ent] with professional standards," and that "a

_____

[1] As a result, the magistrate judge concluded that "Tovar's signature on the plea agreement and statements at the April 14th plea hearing were a 'ritual more sham than real.'" ROA, Vol. 1 at 460 (quoting Blackledge, 431 U.S. at 78).

[2] The magistrate judge also noted that Tovar "produced evidence that suggest[ed] he did not rape his ex-wife," and that "it [wa]s likely that a jury would have acquitted [him] of the two rape charges." ROA, Vol. 1 at 460.

competent attorney would have continued to investigate the rape charges" before allowing Tovar to plead no contest to those charges. Id. at 462. The magistrate judge in turn concluded that "Ayala's failure to entertain th[e available mitigating] evidence, the viability of a defense, and discuss the matter with his client, ensured that Tovar was unable to make an intelligent choice of whether to accept a plea or go to trial." Id.

Respondents objected to the magistrate judge's recommendation. On January 6, 2009, the district court issued a written order denying Tovar's petition and dismissing the action. In doing so, the district court expressly "adopt[ed] the background facts set forth by [the magistrate judge] in her Proposed Findings and Recommended Disposition." Aplt. Br., Att. E at 1. Further, the district court noted "[t]his [wa]s not the first time a court ha[d] been faced with similar allegations on a habeas petition alleging . . . Ayala's perfidy to the detriment of his clients," id. at 4 (citing Berry-Gurule v. Lucero, 215 F.3d 1336 (10th Cir. 2006); Matter of Ayala, 693 P.2d 580 (N.M. 1984)), and thus stated it "ha[d] little reason to doubt [the magistrate judge's] conclusion[s] that . . . Ayala (1) told [Tovar] he had reached a side deal with [the state district judge] for a three-year sentence; (2) . . . Ayala never translated the plea agreement into Spanish or read it to [Tovar]; and (3) . . . Ayala never investigated witnesses and evidence that might have challenged Lilia Tovar's testimony regarding the kidnaping and rape to which [Tovar] pled *nolo contendere*." Id. at 4-5 (italics in original).

12

Nevertheless, the district court concluded it would not "allow[] these arguments to prevail after [Tovar] repeatedly represented under oath that (1) he read and understood the plea agreement; (2) he understood he could be sentenced to thirty years; and (3) no one had made any outside promise to him." Id. at 5. "In other words," the district court stated, "if [Tovar] [wa]s allowed to recant his sworn testimony based on an alleged secret promise from defense counsel, how c[ould] any judge rely on a sworn plea colloquy?" Id. In sum, the district court emphasized that "[t]he fundamental problem" with Tovar's habeas petition "[wa]s that it [wa]s built entirely on [Tovar's] admitted perjury before [the state district court]." Id.

Tovar moved for reconsideration of the district court's order, noting that it contained no mention of Tovar's claim that Ayala was ineffective for failing to adequately investigate available mitigating evidence. On May 18, 2009, the district court issued a memorandum opinion denying Tovar's motion for reconsideration. In doing so, the district court concluded that Tovar's "own perjury . . . doom[ed] [his] arguments under either theory of ineffective assistance." Id., Att. F at 3. In other words, the district court concluded that "the legal effect of [Tovar's] plea colloquy resolve[d] the prejudice prong of [Strickland] against [Tovar]." Id. at 4. The district court also concluded, in any event, that Tovar "was not prejudiced by . . . Ayala's failing to investigate [because] that was not a motivating factor in [Tovar's] plea." Id. at 5. Rather,

13

the district court concluded, Tovar pled guilty because he wanted "the three-year sentence he thought . . . Ayala could procure." Id.

Tovar filed a timely notice of appeal.

## II

### *Standard of review*

Typically, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court" is governed by the deferential standards of review established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254(d). In particular, a petitioner seeking federal habeas relief must establish that a state court decision adjudicating a constitutional claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." Id. § 2254(d)(1). We do not, however, apply this "deferential review standard when a federal district court holds an evidentiary hearing and considers new evidence that was not before the state court at the time it reached its decision, even if the state court resolved the claim on the merits." Young v. Sirmons, 486 F.3d 655, 663 (10th Cir. 2007).

In the case at hand, the state district court denied the claims asserted in Tovar's state habeas petition on the merits based exclusively on its review of Tovar's plea colloquy. Thus, the state district court did not consider any evidence outside the trial record in denying Tovar relief. The magistrate judge in this

14

federal habeas proceeding, with the express approval of the district court, conducted an evidentiary hearing on Tovar's claims. In doing so, both the magistrate judge and the district court agreed that Tovar had diligently attempted to develop the factual basis of his claims in state court in accordance with New Mexico state law, and thus was not precluded under 28 U.S.C. § 2254(e)(2) from obtaining a federal evidentiary hearing. In turn, both the magistrate judge and the district court concluded that under the applicable pre-AEDPA standard, Tovar was entitled to a federal evidentiary hearing because his allegations, if true and not contravened by the existing factual record, would entitle him to federal habeas relief. After the evidentiary hearing was conducted, the magistrate judge issued a series of proposed findings of fact, which were ultimately adopted in full by the district court. And, both the magistrate judge and the district court relied on those factual findings in analyzing Tovar's two claims for federal habeas relief. Consequently, because those factual findings were not available to the state district court when it rejected those same claims in the context of Tovar's state habeas proceedings, the state district court's determinations are not entitled to deference under AEDPA. Instead, Tovar's claims are subject to de novo review.[3]

_____

[3] We agree with Tovar that the district court erred in applying AEDPA's review standards and affording deference to the state district court's decision denying state habeas relief. See Aplt. Br., Att. E at 9 ("Based on this record, I cannot say that [the state district court's] acceptance of [Tovar's] plea as voluntary violated the AEDPA standard."); id. at 10 ("The question, then, is whether the conclusion of the New Mexico courts that [Tovar's] plea was free and
(continued...)

15

*Voluntariness of the plea*

Tovar contends the district court erred in concluding that his no contest plea to the pending state charges was knowing and voluntary. For the reasons that follow, we agree and conclude that Tovar's no contest plea was involuntary and therefore constitutionally invalid.

"[I]f a defendant's guilty plea [or no contest plea] is not . . . voluntary and knowing, it has been obtained in violation of due process and is therefore void." Boykin v. Alabama, 395 U.S. 238, 243 n.5 (1969). Thus, "[t]he longstanding test for determining the validity of a guilty plea [or plea of no contest] is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)). A guilty plea or a plea of no contest can "be challenged under the Due Process Clause" if "it develops that the defendant was not fairly apprised of its consequences . . . ." Mabry v. Johnson, 467 U.S. 504, 509 (1984), disapproved of on other grounds by Puckett v. United States, 129 S.Ct. 1423 (2009). For example, an allegation that a defendant's plea "was based on grossly inaccurate advice about the actual time he would serve in prison" gives rise to "a colorable claim of a constitutional violation." Gonzalez v. Crosby, 545 U.S. 524, 542 (2005).

---

[3](...continued)
voluntary is "contrary to, or involved an unreasonable application of, clearly established Federal law . . . .").

The procedures under which a challenged plea was taken play an important, but not decisive, role in determining the validity of the plea. The Supreme Court has "observed that no procedural device for the taking of guilty pleas is so perfect in design and exercise as to warrant a per se rule rendering it 'uniformly invulnerable to subsequent challenge.'" Blackledge, 431 U.S. at 73 (quoting Fontaine v. United States, 411 U.S. 213, 215 (1973)). That said, the Court has also emphasized that "the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings," id. at 73-74, and "[s]olemn declarations in open court carry a strong presumption of verity," id. at 74. Together, these principles establish that "the barrier of the plea or sentencing proceeding record, although imposing, is not invariably insurmountable." Id. Consequently, "federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's expectations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." Id. at 75.

Although the district court in this case acknowledged some of these principles, it erroneously concluded that Tovar's case was analogous to two cases in which this court rejected state habeas petitioners' claims that their guilty pleas were involuntary. In doing so, the district court first stated:

17

The Tenth Circuit found a guilty plea was voluntary on analogous facts in Worthen v. Meachum, 842 F.2d 1179 (10th Cir. 1988), overruled on other grounds, Coleman v. Thompson, 501 U.S. 722 (1991). The defendant therein argued his plea was involuntary because his counsel had misrepresented to him that defendant would be paroled in five or six years and would be given immunity from prosecution on other charges. 842 F.2d at 1183. The Tenth Circuit noted, "Worthen repeatedly stated on the record that he had not been coerced, threatened, or promised anything by his attorney or anyone else." 842 F.2d at 1183. The Court concluded, "When we examine the present case under the standards utilized in Blackledge, we conclude that the broken promises Worthen alleges are insufficient to undermine the voluntariness of his plea." Id. [the actual citation should be to page 1184]

Aplt. Br., Att. E at 13. But the district court overlooked the key facts upon which

we rejected Worthen's claim; facts that are far different than those alleged by

Tovar in this case:

A defendant's expectation of parole that is based on a bad guess by his attorney does not render a plea involuntary. When an involuntariness claim rests on the faulty legal decisions or predictions of defense counsel, the plea will be deemed constitutionally involuntary only when the attorney is held to have been constitutionally ineffective. Here, Worthen was told on the record that neither his attorney nor the court had any authority over the Pardon and Parole Board. He does not suggest any reason why he would have chosen to face the death penalty had his attorney correctly informed him of his parole eligibility; nor does he allege that he would have withheld his guilty plea had he known the true parole possibilities. Under these circumstances, even if Worthen's attorney's alleged mistaken advice about parole rendered his performance inferior to that reasonably expected of attorneys in these circumstances, Worthen was not prejudiced by advice that the court specifically told him was incorrect.

Worthen, 842 F.2d at 1184 (citations omitted). We have then the distinction in

Worthen not of a promise by counsel of a specific sentence, as we have in Tovar's

18

case, but rather only a bad guess regarding parole eligibility.

The district court also concluded that Tovar's case was analogous to Laycock v. State of N.M., 880 F.2d 1184 (10th Cir. 1989). But that case, like Worthen, is distinguishable from the instant case. The petitioner in Laycock, a New Mexico state prisoner who had pled guilty to armed robbery with a firearm enhancement and was sentenced to nine years' imprisonment, filed a federal habeas petition claiming that his defense attorney "materially misrepresented the plea bargain by promising him a suspended sentence if [a particular drug rehabilitation center] accepted him into its drug treatment program." Id. at 1186. We noted that the petitioner made no mention of the drug rehabilitation center in either his initial petition for state postconviction relief or in his subsequent state habeas petition, and only alleged misrepresentation for the first time in his federal habeas petition. Thus, we concluded, understandably, that "[t]he facts and circumstances support[ed] the district court's conclusion that counsel did not materially misrepresent the plea." Id.

The district court in this case also appears to have, contrary to the Supreme Court's admonition in Blackledge, effectively prohibited Tovar from obtaining federal habeas relief due to his in-court statements during the state plea colloquy:

> This case is difficult because based on his disciplinary record, it is easy to convince oneself . . . Ayala might engage in the type of misrepresentation alleged by [Tovar]. [Tovar] also has the benefit of having members of his immediate family testify to having heard representations regarding a deal with [the state district judge].

19

> Unfortunately, [Tovar] also carries the weight of a reputation for a lack of veracity. <u>Even accepting all of [Tovar's] claims regarding . . . Ayala's promises as true, however, they cannot excuse [Tovar's] blatant and repeated misrepresentations under oath to [the state district judge] that he had read the plea agreement and no one had promised him anything else</u>.

Aplt. Br., Att. E at 14-15 (emphasis added). In short, the district court refused to grant federal habeas relief due to what it characterized as Tovar's "blatant and repeated misrepresentations under oath to [the state district judge] that he had read the plea agreement and no one had promised him anything." <u>Id.</u> at 15. But nothing in Supreme Court precedent suggests that a due process violation resulting from the entry of an unknowing plea can be overlooked due solely to the defendant having made false in-court statements during the plea hearing. Indeed, such a rule would be contrary to <u>Blackledge</u>'s admonition that federal courts not "adopt a *per se* rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." 431 U.S. at 75. Moreover, the district court's conclusion overlooks the fact that Tovar's responses during the plea colloquy were, as the magistrate judge aptly concluded, "a courtroom ritual more sham than real." <u>Id.</u> at 78.

Indeed, Tovar testified during the federal evidentiary hearing, when questioned why he responded "Yes" during the plea colloquy when asked by the

20

state district judge if he understood he could receive a sentence of up to thirty years' imprisonment: "I said 'Yes' because Ayala was the one telling me what answer to give to the judge, when it was 'Yes' and when it was 'No,' because of the plea agreement we had for three years between him and [the state district judge] and me." ROA, Vol. 4 at 590. More specifically, Tovar testified: "When the [state district] judge was asking the answers – I mean when the judge was asking the questions, Anthony Ayala was standing on my left side, and he was giving me the answers. And I remember very well hearing those two words: 'Yes.' 'No.' 'Yes.' 'No.'" Id. Likewise, Tovar testified, when questioned why he responded "No" when asked by the state district judge "if anyone had made any outside promise to [him]": "I said 'No' because of the relationship; and because of the best attorney[4], Anthony Ayala; and his friendship with [the state district judge]; and the agreement we had for three years; him saying, 'Don't worry. Trust me. Just go along with everything I say.'" Id. at 590-91.

We conclude, applying the Blackledge analytical framework, that Tovar's no contest plea was the product of misrepresentations by Ayala so significant "as to make [Tovar's no contest] plea a constitutionally inadequate basis for [his current] imprisonment." 431 U.S. at 75. According to Tovar, Ayala repeatedly

---

[4] Tovar testified earlier in the proceeding that when he met with Ayala prior to the plea hearing, Ayala told him he was friends with the state district judge and that he (Ayala) "[wa]s the best attorney; to trust him." ROA, Vol. 4 at 588.

21

stated that he was the best attorney, that he had a special relationship with the state district judge, and that the state district judge had agreed to impose a three-year sentence on Tovar. As the magistrate judge emphasized, this latter representation "was not a predication, probability, or an estimate, but rather a promise" to Tovar. ROA, Vol. 1 at 459. Tovar in turn believed these representations and thus, at the time of the plea hearing, was not fairly apprised of the consequences of his plea. In other words, Tovar's reliance on Ayala's blatant and significant misrepresentations about the amount of time Tovar would spend in prison rendered his no contest plea unknowing and violative of Tovar's due process rights. See generally Hill, 474 U.S. at 56; Boykin, 395 U.S. at 243 n.5.

In light of this deprivation of Tovar's constitutional rights, we conclude that the appropriate course of action is to reverse the judgment of the district court and remand with instructions to conditionally grant Tovar's federal habeas petition, subject to the State of New Mexico, within a reasonable time, allowing Tovar to withdraw his no contest plea and proceed on the criminal charges that were filed against him.[5] See generally Nunes v. Mueller, 350 F.3d 1045, 1056-57 (10th Cir. 2003) (discussing the broad discretion afforded federal habeas courts in

_____

[5] For essentially these same reasons, we conclude that Tovar would also be entitled to relief under his alternative theory that Ayala was constitutionally ineffective in advising Tovar that he (Ayala) had secured the state district judge's agreement to sentence Tovar to a three-year prison sentence. Also, in light of these conclusions, we find it unnecessary to address Tovar's remaining claim that Ayala was constitutionally ineffective for failing to adequately investigate.

22

fashioning appropriate relief).

### III

The judgment of the district court is REVERSED and the case REMANDED to the district court with instructions to conditionally grant Tovar's federal habeas petition, subject to the State of New Mexico, within a reasonable time, allowing Tovar to withdraw his no contest plea and proceed on the criminal charges against him. Appellant's motion to seal the briefs is GRANTED.