**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2575-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANDRE MELLS, a/k/a
RAHMEL JONES, RAMEEL
JONES, JOSH MELLS, RAHJAN
MILLS, ANDRE WHITE,
AUNDRE MELLS, ANDRE
MELS, TYREE WHITE,
JAMALE EDWARDS, TYRELL
WHITE, and TYREE SCOTT.

     Defendant-Appellant.

_____

Submitted June 1, 2020 – Decided May 4, 2021

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 11-12-2140 and 11-12-2142.

Joseph E. Krakora, Public Defender, attorney for appellant (Brian D. Driscoll, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendant Andre Mells appeals from the trial court's denial of post-conviction relief after an evidentiary hearing on some of his claims. Mells collaterally challenges his convictions for first-degree purposeful murder and related second-degree weapons offenses.

On appeal, he contends that his trial counsel provided ineffective assistance by not obtaining his consent before urging the jury to consider lesser-included offenses, and by not filing a Brady[1] motion where the State failed to preserve, or to provide the defense with, crime-scene video footage. He also argues that trial counsel ineffectively addressed inconsistencies in three eyewitnesses' descriptions, and responded ineffectively when one eyewitness quoted the victim's identification of defendant. Mells argues:

POINT I

THE COURT ERRED IN FINDING THAT THE CLAIMS OF INEFFECTIVE ASSISTANCE DID NOT

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

2

A-2575-18

PREJUDICE DEFENDANT AND WOULD NOT HAVE CHANGED THE RESULT OF THE TRIAL.

POINT II

THE COURT ERRED IN FAILING TO FIND COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILURE TO GET DEFENDANT'S PERMISSION TO ARGUE FOR THE LESSER INCLUDED CRIMES.

POINT III

THE COURT SHOULD ORDER A NEW TRIAL BECAUSE COUNSEL VIOLATED HIS SIXTH AMENDMENT RIGHT TO CHOOSE THE OBJECTIVE OF HIS DEFENSE. MCCOY V. LOUISIANA, 584 U.S. ___ (2018)[.] [(]NOT RAISED BELOW[)].

POINT IV

THE COURT ERRED IN FAILING TO FIND COUNSEL INEFFECTIVE FOR FAILURE TO FILE A MOTION FOR THE STATE'S FAILURE TO PRESERVE AND TURN OVER THE VIDEO RECORD. BRADY V. MARYLAND, 373 U.S. 83 (1963).

We affirm.

I.

We presume the reader's familiarity with the underlying case, which we detailed on direct appeal. State v. Mells, No. A-1035-14 (App. Div. Apr. 3,

2017) (Mells I).  As we address the points on appeal, we will highlight relevant facts from the trial and the PCR hearing.

First, we consider Mells's argument that trial counsel ineffectively addressed inconsistencies in eyewitness testimony, as well as one eyewitness's disclosure that the dying victim named defendant.

Because the court rejected this aspect of defendant's petition without an evidentiary hearing, we review its related findings de novo.  See State v. O'Donnell, 435 N.J. Super. 351, 373 (App. Div. 2014).

Three eyewitnesses testified at trial:  Deborah Jones, Arlene Hopkins, and LaStarr LaGrier.  Jones and Hopkins gave mutually-consistent testimony; but LaGrier, in a recorded statement, claimed she saw things that Jones and Hopkins did not.

Jones was a security guard and a resident at the apartment complex where the homicide occurred.  She testified that her boyfriend dropped her off at the complex on an early afternoon in May.  While still in the car, she heard multiple pop-pop sounds that she thought were firecrackers.  After exiting the car, and while she was standing by a fence, she saw the victim sitting on the ground a little over forty-five feet away.  And she saw defendant — whom she had known for twelve years — approach the victim and then, at close range, shoot him three

or four times with a firearm he held in his right hand. After defendant fled, Jones went to help the victim as best she could until police, and an ambulance, arrived.

Jones testified that nothing obscured defendant's face. He wore a black-and-white striped shirt, black pants ending above his ankles, and a white kufi. Jones spoke to police on the day of the homicide, and identified defendant in a photo array two weeks later. She also identified defendant in court and referred to him as "Dre" in her testimony.

Jones's mother, eyewitness Arlene Hopkins, testified that she heard several shots from her second-floor apartment. When she looked down from her window, she saw the victim collapse. She told him she would call 911. Then someone approached and spoke to the victim — and shot him again.

Much like her daughter, Hopkins said that the shooter wore a black-and-white or blue-and-white shirt, black or dark blue pants, and a white or off-white kufi. But Hopkins could only see the side of the shooter's face; she did not know who he was until the victim named him. After she heard the victim say "Dre," Hopkins understood the shooter to be Andre Mells, whom she knew from the neighborhood.

A-2575-18

As we discussed in our prior opinion, the State had agreed not to elicit the victim's statement.[2] Mells I, slip op. at 4. After Hopkins disclosed it, defense counsel requested a mistrial, which the trial court denied. Instead, the court curatively instructed the jury to disregard the victim's naming of the shooter.

But the court did not instruct the jury to disregard Hopkins's photo-array identification. The State had agreed not to elicit the victim's statement — but it never agreed to suppress the photo-array identification. According to Hopkins, about two weeks after the homicide, she identified Mells as the shooter from a photo array. She implied that she relied on the victim's statement when she made this identification; specifically, she stated, "I did basically point out Andre based on his name." However, in court, she declined to identify defendant as the shooter, stating, "I can't say he's the actual shooter but that's the photograph I -- I observed."

Evidently to end on a positive note, the prosecutor returned to Hopkins's photo identification in the following exchange:

> Q.     . . . Who is in S-28?
>
> A.     Andre.

---

[2] The State apparently did so to moot a defense request to suppress the statement on hearsay grounds. So, the trial court never ruled on the statement's admissibility. We held that it was admissible as an excited utterance. Mells I, slip op. at 14-16.

Q. And you identify him as what, Miss Hopkins? What did you tell the police he did?

But her identification of defendant drew on the victim's naming, which the court had directed her to avoid. Apparently in a quandary, Hopkins answered:

A . His name is Dre --

The prosecutor cut in,

Q. I mean -- I mean what did you tell him he did? Not what his name is.

A. What do you mean, what he did?

Q. What did he do -- what did you identify him as doing?

A. Shooting, not -- okay.

On cross-examination, defense counsel evidently tried to suggest that Hopkins selected defendant from the photo array because she discussed the case with her daughter, who believed defendant was the shooter. Hopkins repeated that she was unable to identify the shooter when he first approached and shot the victim. Counsel elicited that Hopkins discussed the case with her daughter and that, "by and by," Hopkins went "to the Prosecutor's Office and looked at some photos and picked out a picture of Dre." Then, counsel again inquired about Hopkins's discussions with her daughter.

7

LaGrier, the third eyewitness, gave a statement (which the police video-recorded) more than two months after the homicide. At the time, she faced multiple pending drug-related charges. At trial, LaGrier recanted her earlier statement. She said that she was not present at the shooting and that she did not recall what she previously told police. After a Gross[3] hearing, the trial court permitted the State, through the detective who interviewed LaGrier, to present her recorded statement to the jury.[4]

In her statement, she evidently said she saw defendant shoot the victim. Unlike Jones and Hopkins, LaGrier said that defendant's face was partly obscured by a mask. She also said that defendant carried two weapons.

LaGrier's statement about the guns was consistent with the evidence that the shooter or shooters used .38 and .45 caliber bullets. By contrast, Jones said

---

[3] State v. Gross, 121 N.J. 1 (1990).

[4] Defendant has not included, in the record on appeal, the video recording or the transcript — as redacted — that was presented to the jury. A party must include "such other parts of the record . . . as [he] should reasonably assume will be relied upon by the respondent in meeting the issues." R. 2:6-1(a)(1)(I). An appellate court need not attempt to review an issue when the relevant portions of a record are missing. Cmty. Hosp. Grp. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 381 N.J. Super 119, 127 (App. Div. 2005). We note also that the transcript was marked for identification, but not apparently admitted into evidence. Consequently, the trial transcript should have included a verbatim record of the recording replayed at trial. R. 1:2-2.

she saw only one weapon. But she did not see the first shots, which felled the victim.

LaGrier also said that multiple persons were "beefing" and shooting, although she did not identify anyone other than defendant. Jones and Hopkins only saw one man shooting (although they both heard shots, or what may have been shots, before making any observations). LaGrier was the only eyewitness who said she saw defendant flee in a car (a white Chevrolet Lumina).

On cross-examination, defense counsel elicited that three days after LaGrier provided her incriminating statement, she secured a favorable disposition of her pending drug matters; furthermore, she had recently secured admission to Drug Court after violating probation. Defense counsel also elicited LaGrier's statement that if she did tell police that she saw defendant kill the victim, it would have been a lie. In addition, counsel highlighted differences between LaGrier's testimony and that of Jones and Hopkins, and the detective's decision not to pursue other leads suggested by LaGrier's statement.

To secure PCR based on defense counsel's approach to the eyewitnesses' inconsistencies and Hopkins's reference to the victim naming defendant, defendant must satisfy both prongs of the test established in Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Fritz, 105 N.J. 42, 58 (1987)

(adopting the test for claims of ineffective assistance). That is, defendant must show, by a preponderance of the evidence, State v. Holland, 449 N.J. Super. 427, 435 (App. Div. 2017), that (1) counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," Strickland, 466 U.S. at 687; and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different," id. at 694.

Defendant failed to satisfy the first prong. Regarding the eyewitnesses' testimony or statements, defense counsel ably tried to paint LaGrier's video statement as a fabrication by a person seeking favorable treatment. As for Jones's and Hopkins's testimony, defense counsel elicited from both women that they conferred before they selected defendant from the photo array. Defense counsel also tried to raise questions about the witnesses' ability to see the shooter clearly.

Regarding Hopkins's reference to the victim naming defendant, we are unpersuaded that defense counsel, to provide constitutionally-effective assistance, had to confirm in advance that the State had properly prepared its witness not to volunteer evidence that the State had already agreed not to elicit. Doing so may have been worthwhile, but it was not constitutionally mandated.

Furthermore, after the disclosure, defense counsel vigorously argued for a mistrial.

And as we have already held, defendant did not suffer prejudice from the disclosure. The jury was presumed to follow the court's curative instruction, and, in any event, the victim's hearsay statement was admissible. Mells I, slip op. at 15, 18-19. In considering a petition for PCR based on ineffective assistance of counsel, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged" and whether "the result . . . is unreliable" because of counsel's failures. Strickland, 466 U.S. at 696. In short, because defendant was not entitled to suppress the naming, its inadvertent disclosure did not deny him a fair trial.

Nor did defense counsel provide ineffective counsel when Hopkins later referred to defendant as "Dre" during direct examination, or when defense counsel himself referred to "Dre" during cross-examination. The State was free to elicit that Hopkins identified defendant in the photo array. And defense counsel may have used the name "Dre" to suggest that Hopkins selected defendant from the array only after conferring with her daughter, who believed defendant guilty.

A-2575-18

II.

Defendant also argues that counsel was ineffective when he neglected to file a Brady motion concerning the State's failure to turn over surveillance video.

At the PCR hearing, the investigating detective testified that he viewed the video recording taken by a surveillance camera from atop a medical school building, but he decided not to retain a copy of the video. He testified that the camera did not record anything of evidential value; in particular, the video lacked sufficient detail to help anyone identify the shooter. The detective surmised that the camera might have been used to monitor traffic.

Defense counsel testified that he did not file a Brady motion because he concluded that the camera was too far away to help the defense, and the video was "[o]ne less thing to deal with." He explained, "I didn't need any . . . evidence of a guy running around with a kufi highlighted on that."

The PCR court credited the detective's testimony and concluded that the video did not contain material evidence. Therefore, a Brady motion would not have changed the outcome of the trial.

We discern no error. We defer to the PCR court's factual finding — based on its credibility assessment of the evidentiary-hearing witnesses — that the video contained no useful evidence. See State v. Nash, 212 N.J. 518, 540 (2013)

(stating that a reviewing court must defer to the PCR court's fact-findings if "sufficient credible evidence in the record" supports those findings, because the PCR judge is better situated to assess witness credibility).

Due process requires the State to disclose exculpatory evidence upon request. Brady, 373 U.S. at 87. "[T]o establish a Brady violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." State v. Martini, 160 N.J. 248, 268-69 (1999). Evidence is "material" "if there is a 'reasonable probability' that timely production of the withheld evidence would have led to a different result at trial." State v. Brown, 236 N.J. 497, 520 (2019).

Based on the court's finding, the evidence was neither favorable to the defense, nor material. A Brady motion would have failed. And it is not ineffective assistance of counsel to withhold a meritless motion. State v. O'Neal, 190 N.J. 601, 619 (2007).

### III.

Finally, defendant argues that his trial counsel was ineffective because (1) he failed to obtain defendant's permission to argue for lesser-included crimes, including manslaughter; and (2) his summation's references to recklessness were both improper and prejudicial to defendant.

In summation, counsel tried to argue that the eyewitnesses had wrongly identified defendant as the shooter. He pointed out that, because Jones saw someone shoot a person who was already on the ground, she did not see "the whole thing." He also suggested that Jones was actually up in her mother's apartment when the shooting occurred.

Counsel further argued that Hopkins could not make an identification because she did not have a direct view. He suggested, too, that upon hearing gunshots, Hopkins's first instinct was to protect the children she was watching that day, not to look out the window.

He also highlighted discrepancies between LaGrier's testimony and that of Jones and Hopkins. He challenged LaGrier's motive, arguing that she would "come in with any story" to get help in dealing with her pending charges.

Defense counsel argued in the alternative that, even if defendant was the shooter, he did not commit murder; rather, he committed one or more "lesser included crimes":

> I submit to you, as I've indicated in my opening, Mr. Mells is not guilty of murder. He's not guilty of a purposeful and knowing murder. These circumstances that culminated in this result of Mr. Denmark [the victim] was something that, I submit, was developing. Some conflict between these individuals, and somebody was trying to send him a message. The intent was not to kill, recklessly causing death. Those are

14

words that you're gonna [sic] hear by the Judge. Causing serious bodily injury resulting in death under circumstances manifesting extreme indifference to the value of human life. That's some of what's going on here.

And after arguing that the eyewitness identifications were not accurate beyond a reasonable doubt, counsel continued to press the "lesser included crimes" argument:

> And it's just -- it's not -- we're talking about did he do it? Or didn't he do it? It's what did he do? If your conclusion is that Mr. Mells is the shooter, or part of what's going on that resulted in [the victim's] demise[,] I submit to you there's ample testimony here that are [sic] this is not a situation where one individual walks up to another individual and then shoots him ten times. There's a history. We can infer that, that there's a history. And as a result of that which we can infer, this is not purposeful and knowing murder. It's not purposeful and knowing. It's the result of recklessly [sic].
>
> Who's living recklessly? That's for you to determine. But at the end of the day, that's what we're dealing with here and, I submit to you, the lesser included offenses . . . are more applicable to the facts and circumstances of this case that we know of, because I submit to you there's a lot that's unknown here.

This alternative argument dominated counsel's summation. Counsel also repeatedly suggested that the victim lived recklessly and engaged in reckless

A-2575-18

behavior, prompting multiple sustained objections and the court's admonition that there was no evidence regarding the victim's behavior.

Counsel testified at the PCR hearing that he disclosed his strategy to defendant, although counsel did not obtain defendant's permission to argue for the lesser-included offenses. Counsel stated, "I advised him . . . that, you know, the case could be tried to a circumstance where the jury could have an opportunity to consider a lesser included offense of . . . aggravated manslaughter or manslaughter." Counsel added he advised defendant that "[m]aybe even a self-defense might have been arguable, arguably relevant." Counsel called it a "one-way discussion," because defendant was disengaged, asserting that, as a sovereign person, the State lacked jurisdiction over him.

Counsel testified that his purpose in summation was two-fold: firstly, to place reasonable doubt in the jurors' minds about the shooter's identity; secondly, if the jurors believed that defendant was the shooter, to convince them that the "person [who was] running around doing these things . . . [was] more acting in a reckless behavior [sic] as . . . opposed to purposeful and knowing."

At the hearing, defendant testified that his trial counsel met him in the jail only once, for about forty-five minutes, and that counsel met him away from the jail for sessions of only ten to fifteen minutes. Defendant asserted that counsel

16

"never asked [his] opinion or . . . consent regarding conceding guilt or reckless [sic] in -- in hopes that it might -- in the hopes that the jury might find [him] not guilty." Defendant also stated that he never discussed trial strategy with his attorney. Notably, though, defendant did not testify that had counsel asked permission for the "lesser included crimes" strategy, defendant would have refused it.

The PCR court found defense counsel more credible than petitioner. Specifically, the court found that defense counsel "did confer with Petitioner regarding affirmative defenses prior to trial." The court stated:

> While some of counsel's word choices in isolation could be read to suggest that Petitioner was the person who acted recklessly, taken in context it is clear that counsel's argument does not concede that Petitioner was the shooter. Furthermore, counsel testified at the evidentiary hearing in this PCR that it was his strategy to argue against the crime of murder, and in the alternative — if the jury believed that Petitioner did in fact shoot and kill the victim — that the jury should return a verdict of aggravated manslaughter instead of murder. Given the overwhelming evidence introduced at trial that Petitioner shot the victim, this was a valid strategy and did not prejudice Petitioner's defense.

We shall not disturb the PCR court's determination. As the Supreme Court recognized, some trial decisions are for the attorney to make, and others "are reserved for the client." McCoy v. Louisiana, 138 S. Ct. 1500, 1508 (2018).

17

Trial management is the lawyer's province: [c]ounsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." Some decisions, however, are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.

[Ibid. (citation omitted) (quoting Gonzalez v. United States, 553 U.S. 242, 248 (2008)).]

Where does one place the decision to submit a lesser-included charge to the jury? The decision is tactical, drawing on an attorney's experience; yet it may affect the ultimate verdict. As Professor Uviller observed:

Apart from disagreements concerning the entry of an insanity plea, perhaps the most troubling source of contention is the decision whether to consent to submitting to the jury counts or charges lower than, or included in, the most serious count of the indictment. Tactically, the choice is whether to "go for broke," that is, have the jury vote up or down on the gravest charge, or to provide a possible locus of compromise. Part gamble, part experience, it is difficult to say whether this vital choice belongs among the defendant's reserved prerogatives or has been ceded to the wisdom and caution of counsel.

[H. Richard Uviller, Calling the Shots: The Allocation of Choice between the Accused and Counsel in the Defense of a Criminal Case, 52 Rutgers L. Rev. 719, 748 (2000) (footnote omitted).]

The ABA's Criminal Justice Standards used to suggest that the defendant, after conferring with counsel, should have the final word on whether to submit lesser-included offenses; but the Standards do so no longer.[5]  See Simeon v.

---

[5]  ABA Standards "are guides to determining what is reasonable" in assessing reasonably effective assistance of counsel.  Strickland, 466 U.S. at 688.  The commentary to the 1980 standards stated:

> It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.  Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses.  For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter.
>
> [ABA Standards for Crim. Just., Standard 4-5.2 cmt. at 4-68 (2d ed. 1980).]

By contrast, the 1993 standards stated only:  "It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury," and omitted the statement that the client's decision controls.  ABA Standards for Crim. Just.: Prosecution Function & Def. Function, Standard 4-5.2 cmt. at 202 (3d ed.1993). The latest edition of the standards states that an attorney must defer to a client regarding "any other decision that has been determined in the jurisdiction to belong to the client."  ABA Crim. Just. Standards for the Def. Function, Standard 4-5.2(b)(ix) (4th ed. 2017).

19

<u>State</u>, 90 P.3d 181, 183-84 (Alaska Ct. App. 2004) (comparing ABA Standards for Criminal Justice, Standard 4-5.2).

Neither defendant nor the State point to binding New Jersey authority on the issue of who — attorney or client — gets to decide whether to seek a lesser-included instruction. Nonetheless, without establishing a general rule for all situations involving lesser-included offenses, we are satisfied that defense counsel here provided effective assistance because, as the PCR court impliedly found, he conferred with defendant, and then exercised informed judgment to argue for a lesser-included offense in the face of "overwhelming" evidence that defendant was the shooter.[6]

There is persuasive authority for that conclusion. <u>See, e.g.</u>, <u>Cannon v. Mullin</u>, 383 F.3d 1152, 1167 (10th Cir. 2004) (rejecting ineffective-assistance claim where trial counsel asserted self-defense argument and, in the alternative, argued lesser included offense, stating that "whether to argue a lesser-included offense is a matter to be decided by counsel after consultation with the defendant"), <u>abrogated on other grounds</u>, <u>Simpson v. Carpenter</u>, 912 F.3d 542,

---

[6] We recognize that the PCR court did not expressly find that defense counsel conferred with defendant about lesser-included offenses. But, the court implied as much, by crediting defense counsel over defendant, and by expressly finding that defense counsel conferred with defendant, albeit about affirmative defenses.

576 n.18 (10th Cir. 2018); Simeon, 90 P.3d at 184-85 (rejecting ineffectiveness claim where attorney declined to request lesser-included offenses and defendant did not show that tactical choice to be unreasonable).

Even if defense counsel did not disclose his strategy, we are unconvinced that failure alone would constitute ineffective assistance, particularly absent evidence that petitioner would have objected and dissuaded counsel. Some courts have held that the failure to confer need not render an attorney's decision regarding lesser-included offenses ineffective. See Mathre v. State, 619 N.W.2d 627, 628-30 (N.D. 2000) (rejecting ineffectiveness claim where trial counsel did not confer with the defendant before deciding not to seek instructions on lesser-included offense). In Van Alstine v. State, 426 S.E.2d 360, 363 (Ga. 1993), the court declined to find that the failure to consult regarding lesser-included crimes invariably constitutes ineffective assistance. Although noting that "it is critically important" that defense lawyers confer on such matters, the court concluded that defense counsel was not ineffective because no evidence suggested that the client would have rejected counsel's strategy had counsel consulted him. Ibid.[7]

_____

[7] We acknowledge that some courts have held that defense counsel must defer to a client's wishes on the lesser-included question. See, e.g., People v.

Defendant also misplaces reliance on the United States Supreme Court's decision in McCoy. In McCoy, the Court held that an attorney must abide by a defendant's expressed objection to a strategy of admitting guilt. 138 S. Ct. at 1509. An attorney's failure to do so is a structural error that is subject neither to harmless-error review nor to the Court's ineffective-assistance-of-counsel jurisprudence. Id. at 1510-11.

For three reasons, McCoy provides no help to defendant. First, defendant did not testify in the PCR hearing that he objected to counsel's decision to argue lesser-included offenses, although the PCR court impliedly found that counsel consulted with him. One of McCoy's holdings is directly on point: the Supreme Court held that when an attorney consults with a defendant who does not protest as McCoy did, but rather acquiesces in the strategy of admitting guilt, then counsel's implementation of the chosen strategy does not violate the client's

Brocksmith, 642 N.E.2d 1230, 1232 (Ill. 1994) (following the 1986 supplement to the ABA Standards). However, some defendants have complained (with varying results) when the attorney did defer. Compare In re Trombly, 627 A.2d 855, 855 (Vt. 1993) (rejecting argument that defense lawyer was ineffective "by requesting at the client's insistence that the court not instruct the jury that attempted manslaughter is a lesser included offense of attempted murder"), with Arko v. People, 183 P.3d 555, 560 (Colo. 2008) (reversing conviction where trial court deferred to "defendant's decision over the objection of defense counsel" and refused to give lesser-included instruction).

Sixth Amendment rights. Id. at 1505, 1509 (discussing Florida v. Nixon, 543 U.S. 175 (2004)).

Second, in McCoy, the attorney actually admitted his client's guilt. But here, the PCR court found (with the support of sufficient credible evidence in the record) that Mells's trial counsel did not admit defendant's guilt. Rather, counsel urged the jury members to find that Mells did not shoot the victim. He did encourage them to convict him of a lesser-included offense — but only if they believed that Mells did shoot the victim.

Third, courts have declined to apply McCoy retroactively to collateral challenges of convictions. See Smith v. Stein, 982 F.3d 229 (4th Cir. 2020); Christian v. Thomas, 982 F.3d 1215 (9th Cir. 2020). Defendant presents no argument why we should do so here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23